(No. 74636

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JEFFREY D. RISSLEY, Appellant.

*Opinion filed March 30, 1995—Rehearing denied May 30, 1995.*

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Marc P. Bernabei, State's Attorney, of Princeton (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen, Michael A. Hurst and Arleen C. Anderson, As-

sistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Defendant, Jeffrey Rissley, pleaded guilty in the circuit court of Bureau County to the aggravated kidnapping and first degree murder of six-year-old Kahla Lansing. At a separate sentencing hearing, a jury found that the defendant was eligible for the death penalty based on two statutory aggravating factors. A jury found that defendant was eligible for the death penalty because the murder was committed in the course of an aggravated kidnapping. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6).) The jury also found that defendant was eligible for the death penalty because the "murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(7).) The jury then concluded that there were no mitigating circumstances sufficient to preclude the imposition of the death penalty and the trial judge sentenced the defendant to death. The trial judge also sentenced the defendant to a 15-year prison term for his conviction on the charge of aggravated kidnapping. (See Ill. Rev. Stat. 1991, ch. 38, par. 10—2.) The defendant's death sentence has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) We affirm.

I. Defendant's Arrest and Confession

A review of the record reveals the following facts. On September 28, 1991, six-year-old Kahla Lansing was roller-skating with friends in her neighborhood. At 6:45 p.m., Kahla's mother was unable to locate Kahla in the neighborhood and called police. A witness reported seeing Kahla talking to a man in a red Ford Ranger pickup

truck at approximately 6:30 p.m. The man was described as a white male in his mid-thirties, with medium length brown hair.

As a result of an unrelated investigation by officials in Knox County, the defendant was charged with aggravated criminal sexual assault of a 10-year-old that occurred there on September 27, 1991. Bureau County authorities investigating the disappearance of Kahla Lansing identified defendant as a suspect in that crime based on information obtained from the Knox County investigation. Specifically, Bureau County authorities learned that the defendant left Knox County on September 28, 1991, for Berrien County, Michigan. Defendant drove in an easterly direction on Route 6, which leads to Bureau County. Defendant's general appearance and the red Ford Ranger pickup truck he was driving matched the description of the person the witness had seen Kahla talking to prior to her disappearance.

As a result of the charges against defendant in Knox County, law enforcement authorities in Berrien County, Michigan, were contacted and asked to arrest the defendant, if he could be found there. On October 10, 1991, Berrien County officers arrested the defendant. While in Michigan, the defendant was interrogated by two sets of law enforcement officers concerning the disappearance of Kahla Lansing. Defendant was advised of his *Miranda* warnings, both orally and in writing. Defendant acknowledged he understood those rights and agreed to waive those rights and talk to authorities.

The first set of officers to interrogate defendant consisted of officers from Berrien County and from the Federal Bureau of Investigation. The second set consisted of officers from Illinois. During each interrogation, defendant provided the police with details concerning the abduction of Kahla Lansing. Defendant told the officers that he was traveling from Illinois to Michigan

in his red Ford pickup on September 28, 1991. While en route, defendant detoured into Spring Valley, Illinois, arriving in that area in the late afternoon. Defendant further told the officers that he was an active pedophile and at that time he "hurt inside" and was seeking a child as a means of relief. The defendant then described encountering Kahla Lansing, who was roller-skating in a residential area.

The defendant stated that he observed Kahla while driving around in his truck. Defendant stopped the vehicle and engaged Kahla in conversation. Kahla entered defendant's vehicle, agreeing to accompany defendant to a convenience store for the purpose of purchasing soft drinks. Defendant and Kahla visited a nearby convenience store and purchased two soft drinks and a candy bar. Defendant and Kahla then left the store and together drove aimlessly around Illinois.

Defendant stated that after several hours of travel, he eventually encountered an abandoned farm located near Clinton, Iowa. The farm was located at the end of a dirt road and consisted of several buildings. Defendant secreted the truck in a pig coop building and then entered the barn. In the barn, defendant secured some mattresses from the bed of an old truck and also found some blankets. Defendant and Kahla slept there that night. At approximately dawn, defendant stated, he performed anal intercourse upon Kahla and then both defendant and Kahla went back to sleep.

Defendant and Kahla awoke in the barn to the sound of gunshots. Defendant stated that both he and the child were afraid because some of the gunshots were very close. Defendant further stated that Kahla was becoming hysterical and was repeatedly stating that they should leave. The defendant told the officers that he was afraid that he might be discovered and began losing control. Defendant then described how he obtained an

electric cord from inside the barn and, with Kahla standing face to face with him, twisted the cord around the back of her neck. Defendant stated that Kahla's face turned red, she became limp, and he allowed her to fall to the ground. Defendant further stated that at this time he checked Kahla's heartbeat and determined that it was still beating. Defendant then said he left Kahla with the cord knotted around her neck and exited the barn to determine where the shooting was coming from.

Once outside the barn, defendant could not determine from which direction the sound of the gunfire originated. Defendant stated that, finding nobody around, he intended to go back and untie the cord from around Kahla's neck. However, defendant then again checked Kahla's heartbeat and determined she was dead. Defendant stated he then lifted Kahla on his shoulders and placed her in the upper loft. Defendant then reentered his vehicle and left the farm. Defendant drove to Michigan, where he remained until his arrest.

During the course of his interviews, defendant drew a map of the farm where Kahla's body could be found. Defendant also described Kahla's clothing as a multicolored sweater, dark green with a black base, blue jeans and roller skates. Defendant stated that he left Kahla fully clothed except for her roller skates. A search was conducted in the area identified by defendant that resulted in the discovery of Kahla's body. Kahla was found fully clothed except for her roller skates in the second floor of a barn with a white electrical cord wrapped tightly around her neck. The cord matched an electric blanket that was found at the scene. Also observed in the barn was a truck, an old mattress and a blue bed sheet.

On October 11, the Iowa State Medical Examiner, Dr. Thomas Bennett, performed an autopsy on Kahla. Dr. Bennett determined the cause of death to be ligature

strangulation from the electrical cord. Dr. Bennett also found injuries to the anal and vaginal areas. Forensic scientist Jennie Hahn determined that seminal material found on Kahla's undergarments and on a bedspread at the barn could have come from defendant.

On October 22, 1991, the Bureau County State's Attorney filed a two-count indictment against defendant. The first count charged defendant with aggravated kidnapping. (Ill. Rev. Stat. 1991, ch. 38, pars. 10—2(a)(1), (a)(2).) The second count charged defendant with first degree murder, in that the death of Kahla Lansing occurred during the commission of a kidnapping. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(3).) The indictment also indicated that the State intended to seek the death penalty pursuant to two statutory aggravating factors. (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(b)(6), (b)(7).) On March 2, 1992, the indictment was amended to allege that the kidnapping that began in Bureau County, Illinois, continued until the death of Kahla in Iowa. Defendant argues that this amendment also added counts of intentional and knowing murder. The State disputes this characterization.

## II. Defendant's Guilty Plea

On June 11, 1992, defendant withdrew his plea of not guilty and entered a plea of guilty to the charges contained in the amended indictment. At that hearing, the State's Attorney read the amended indictment and recounted a factual basis for defendant's plea into the record. In addition, the trial judge admonished the defendant concerning the possible penalties, including the possibility of the death penalty. The trial judge accepted defendant's plea of guilty on both charges.

## III. Motion to Withdraw the Guilty Plea

On June 22, 1992, defendant moved to withdraw his guilty plea on grounds that it was not knowingly or

intelligently entered. Defendant argued that his counsel was ineffective for failing to properly advise him concerning the consequences of pleading guilty. Specifically, defendant argued that he was not advised by his attorney that he could waive a jury trial and have his case tried to a judge. In addition, defendant argued that he was not advised that by entering a guilty plea he was waiving the issue of whether Illinois courts had jurisdiction over the murder charge.

A hearing was held on the motion to withdraw the defendant's guilty plea. The defense called Andrea Lyon, an experienced death penalty defense attorney, as its only witness. Lyon testified that she had discussed defendant's case with one of defendant's attorneys. Lyon further testified that she was surprised to learn during this conversation that defendant had pleaded guilty without negotiation and without defense counsel's conducting an extensive investigation into mitigating circumstances. The State objected to Lyon's testimony. The State argued that Lyon's testimony was not relevant to whether defendant's plea was knowingly entered. The court sustained the State's objection.

The State called two witnesses at the hearing. The State first called James Reed, a deputy jailor with the Bureau County sheriff's department. Reed testified that he was summoned to defendant's cell block by defendant on June 20, 1992, for the purpose of getting cigarettes. Reed testified that at that time defendant told him that he did not want to withdraw his plea. The prosecution also called Troy Wren, the Bureau County adult probation officer. Wren testified that he spoke with defendant on June 23, 1992, and defendant told him that he pleaded guilty in order to avoid trial.

After further argument from counsel, the trial court denied defendant's motion to withdraw his guilty plea. The trial judge noted that he had admonished defen-

dant regarding the consequences of entering the guilty plea, including that defendant was waiving the right to have his guilt determined by the court. The trial judge also stated his belief that defendant had not waived his right to challenge whether there was subject matter jurisdiction over the murder charge in Illinois. Given the broad factual basis for the charges against defendant, the court found that defense counsel's representation did not fall below professional norms and that defendant suffered no prejudice. For these reasons, the judge ruled that defendant's counsel was not ineffective and defendant's plea of guilty was knowingly entered.

### IV. Capital Sentencing Hearing

The defendant having been convicted on the basis of the guilty plea, the case then proceeded to jury selection for the capital sentencing hearing. After a hearing concerning pretrial publicity in Bureau County, the trial court determined that a fair and impartial jury could not be selected there. The jury was therefore selected from a pool of potential jurors in nearby Grundy County. Additional facts concerning the jury selection will be provided as necessary to address defendant's challenges.

After the jury was empaneled, the case proceeded to the eligibility phase of the bifurcated capital sentencing hearing. The State alleged that defendant was eligible for the death penalty based on two statutory aggravating factors. First, the State alleged that defendant was eligible for the death penalty on grounds that the defendant committed the murder in the course of an aggravated kidnapping. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6).) Second, the State alleged that defendant was eligible for the death penalty because the victim was less than 12 years of age and the death resulted from "exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(7).) The parties agreed to stipulate to defendant's

conviction on the charges contained in the amended indictment.

The jury heard testimony from a variety of witnesses. Among these was Susan Ballerin, Kahla's mother, who identified Kahla's birth certificate dated May 17, 1985. Ballerin also testified that she identified Kahla's body after it was recovered from Iowa. FBI Agent Stanley Lapekas also testified. Lapekas testified to locating defendant in Michigan and to defendant's first confession. Spring Valley Police Chief Doug Bernabei testified about his investigation into Kahla's disappearance and defendant's second confession. Harold Brignadello, from the Illinois State Police Department of Criminal Investigations, identified various photographs taken at the barn where Kahla's body was recovered. Carl Bessman, a criminologist at the Iowa Department of Criminal Investigations, identified certain photographs taken at the barn, as well as certain items found there.

The defense objected to the introduction into evidence of six crime scene and autopsy room photographs. These photographs depicted Kahla as she appeared the day she was found, some 13 days after her death. For this reason, photographs of the victim's face showed evidence of decomposition and insect infestation. A hearing was held outside the presence of the jury regarding the admissibility of these photographs.

At the hearing, the defense argued that these photographs were not relevant and that any probative value was outweighed by the prejudice to the defendant. The defense also argued that several of the photographs were cumulative. The prosecution argued that the photographs showed the results of defendant's conduct, including the ligature marks around the victim's neck and the results of secreting the victim's body. The court, relying on *People v. Simms* (1991), 143 Ill. 2d 154, found

that the photographs were relevant to prove the defendant's intent under section 9—1(b)(6) of the Criminal Code of 1961. The court also found that the pictures were relevant evidence as to whether defendant's conduct was exceptionally brutal or heinous within the meaning of section 9—1(b)(7). The court therefore denied the defendant's motion and the photographs were published to the jury.

Dr. Thomas Bennett, the Iowa State Medical Examiner, conducted the autopsy on the victim. Dr. Bennett testified that the victim died from ligature strangulation. Dr. Bennett further testified that the victim was conscious for approximately 15 seconds and experienced "severe pain" during the strangulation. Dr. Bennett also testified that the victim suffered pain due to vaginal and anal tearing from the forcible sexual penetration. Autopsy photographs depicting the injuries to the victim's vagina and anus were admitted over defense counsel's objection. On cross-examination, Dr. Bennett described the decomposition process that had taken place on the victim's body.

Jennie Hahn, a forensic scientist with the Illinois State Police, testified about certain tests she conducted. Hahn testified that seminal fluid found on the bedspread from the crime scene was consistent with defendant's blood type. Hahn further testified that seminal material was found on the victim's underpants and on the rectal swab taken from the victim as part of the rape kit. However, testing on these items failed to reveal the blood type.

At the close of the prosecution's case at the eligibility phase of defendant's capital sentencing hearing, defendant moved for a directed verdict in relation to both statutory aggravating factors. First, defendant argued that he suffered an impermissible "double enhancement" under section 9—1(b)(6). In support, defendant

argued that the offense of aggravated kidnapping was used both as the predicate felony for felony murder and as the basis for eligibility under the statutory aggravating factor of murder in the course of an aggravated felony. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)(c).) Second, defendant argued that the State had failed to prove as a matter of law that defendant's behavior was exceptionally brutal or heinous within the meaning of section 9—1(b)(7). The trial judge denied the motion for a directed verdict as to both statutory aggravating factors.

After the denial of defendant's motion for a directed verdict, the case went to the jury for a determination as to whether the prosecution had proved the existence of either statutory aggravating factor. During its deliberations, the jury sent a note to the trial judge asking for the legal definition of "heinous" and "wanton cruelty." Based on the definition of the word "heinous" in *People v. La Pointe* (1981), 88 Ill. 2d 482, the trial court sent an instruction to the jury that defined heinous as "hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal." Because no decision had previously defined the term "wanton cruelty," the parties and the court agreed not to define that term for the jury. Subsequently, the jury returned verdicts finding the defendant eligible for the death penalty under both section 9—1(b)(6) and section 9—1(b)(7).

The defendant's capital sentencing hearing then proceeded to the second phase. The second phase began with the prosecution calling several minor witnesses in aggravation. The prosecution first called 11-year-old S.A. and questioned her about her encounter with the defendant on September 28, 1991. S.A. testified that she was walking to a convenience store with her sister when defendant pulled his truck over and asked for directions. S.A. also testified that defendant attempted to lure her

into his truck by offering her a ride to a convenience store. S.A. and her sister declined defendant's invitation and ran home.

The prosecution then called A.W., a 12-year-old girl. A.W. testified that she met defendant when he stayed overnight in her house as a guest. The following morning, defendant was to drive A.W. to school in his truck. Instead, A.W. testified, defendant drove her out of town to a cornfield. A.W. testified that, at the cornfield, defendant retrieved a rope and tied A.W.'s hands together and secured the rope to the rear-view mirror. A.W. further testified that defendant then performed oral sex on her, licked her breasts, rubbed his penis on her vagina and performed anal intercourse upon her.

The prosecution also called V.S., a 13-year-old girl. V.S. testified that she went camping with the defendant and two other minors, including her brother. While on this trip, V.S. testified, the van they were traveling in became stuck in an orchard. V.S. testified that when her brother and the other minors went to seek help, defendant trapped her in the van and began slapping her in the face and sides. V.S. testified that defendant then performed anal intercourse upon her.

The prosecution also called as witnesses three children who had stayed at the residence of defendant's grandmother. T.S., a 12-year-old boy, testified that after watching television with defendant, they both retired to the defendant's bedroom. T.S. testified that defendant then started pulling on his penis until ordered to stop. D.H., a 10-year-old boy, also testified that he was attacked at the residence of defendant's grandmother. D.H. testified that defendant grabbed him and attempted to remove his clothing, but he managed to break free. J.S., an 11-year-old girl, testified that she awoke in the night while staying at that residence and found that defendant had removed her underwear and was performing oral sex upon her.

Spring Valley Police Chief Doug Bernabei testified concerning defendant's previous convictions in Texas. First, Bernabei testified from a police report that indicated defendant performed oral sex on, and masturbated, a 12-year-old boy in 1983. The prosecution then identified a certified copy of the court record indicating that the defendant had pleaded guilty to aggravated sexual abuse in relation to that occurrence and was sentenced to 10 years' shock probation. Second, Chief Bernabei testified from a police report that indicated defendant had molested a seven-year-old girl on numerous occasions while he stayed at her home. The prosecution then identified a certified copy of the court record indicating that defendant pleaded guilty to indecency with a child in relation to that occurrence and again received 10 years of shock probation.

The prosecution also presented testimony from Jim Reed, a Bureau County deputy sheriff and jailor. Reed testified that defendant attempted to escape by removing bricks from his cell wall. Reed further testified that after he returned from reporting the incident, he found that defendant had attempted suicide by hanging himself. Reed also described rescuing defendant and stated that defendant became violent at that time. Reed testified that defendant was treated at a hospital for injuries received in the suicide attempt and then returned to the Bureau County jail.

The defendant then introduced evidence in mitigation from a variety of expert witnesses. First, defendant presented the testimony of Dr. George Savarese, a licensed clinical social worker. Dr. Savarese testified that he conducted a psychosocial developmental history of the defendant. In conducting this review, Dr. Savarese interviewed defendant and reviewed various police reports, medical records and educational records. In addition, Dr. Savarese reviewed interviews of defendant's family, neighbors, teachers and employers.

From this information, Dr. Savarese testified that defendant suffered from mental problems that were attributed to traumatic events throughout his life. Dr. Savarese testified that five months prior to defendant's birth, his father committed suicide. In order to cope with this tragedy, his mother was heavily tranquilized while defendant was in the womb. After defendant's birth, his mother married a man who also reportedly committed suicide, one of his brothers developed leukemia and another died of sudden infant death syndrome. According to Dr. Savarese, these traumatic events took a heavy emotional toll on defendant's mother and prevented the normal bonding that occurs during a child's formative years.

Defendant also presented expert testimony from Dr. Lyle Rossiter, a licensed psychiatrist. Dr. Rossiter testified that defendant suffered from a severe borderline personality disorder with sociopathic features and pedophilia. Dr. Rossiter described defendant's troubled early childhood and the corresponding effects on defendant's development also described by Dr. Savarese. Dr. Rossiter also testified to early indications of defendant's developmental problems, including that defendant was diagnosed with attention deficit disorder and had a history of delayed speech development.

Dr. Rossiter and Dr. Savarese both testified concerning defendant's reports of sadistic sexual abuse by his stepfather and mother, and childhood incest. Neither expert could confirm whether these events actually occurred or whether they were fabricated by the defendant. However, both stated that their diagnosis would not change even if the events had been fabricated because such fantasies are consistent with defendant's diagnosis. Dr. Diane Alber, a psychologist, testified to having treated defendant as a condition of defendant's release from prison in 1984. Dr. Alber described defen-

dant as being unable to cope with stress and suffering from depression during that time. Dr. Alber further testified that defendant fantasized about romantic relationships with young girls and that he was compulsive, immature and progressively unable to distinguish between reality and fantasy. Dr. Alber also testified that defendant's homosexual lover at that time reported to her that defendant had made advances towards a 13-year-old girl.

After receiving this and other evidence, the jury returned a verdict finding that there were no factors in mitigation sufficient to preclude the imposition of death. The court also sentenced defendant to 15 years' imprisonment on his conviction for aggravated kidnapping. Defendant's post-trial motion was denied and this appeal followed. See Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).

### V. Issues Presented for Review

On appeal, defendant argues: (1) that his guilty plea should be vacated because the trial court lacked subject matter jurisdiction over intentional and knowing murder counts allegedly contained in the amended indictment; (2) that his guilty plea should be vacated because his counsel was ineffective for failing to move to dismiss the knowing and intentional murder counts on jurisdictional grounds and for allowing the defendant to plead guilty to those counts; (3) that his guilty plea should be vacated because the court did not admonish defendant that he could not be convicted of knowing or intentional murder and because trial counsel failed to object to the defective admonishment; (4) that his death sentence should be vacated because the offense of aggravated kidnapping was used as a double enhancement; (5) that it was plain error for the court and the parties to indicate at the eligibility phase that defendant's plea of guilty to first degree murder established the mental

state required to be proved beyond a reasonable doubt under section 9—1(b)(6); (6) that his guilty plea was not knowing and voluntary where the court failed to admonish defendant that by pleading guilty to first degree murder and aggravated kidnapping, he was admitting his eligibility for the death penalty; (7) that he was denied his right to a fair and impartial jury where the trial court refused to excuse venireperson Swinney for cause; (8) that he was also denied a fair and impartial jury where the trial court excused venireperson Gallick for cause; (9) that he was denied a fair capital sentencing hearing by the introduction of crime scene and autopsy photographs of the victim; (10) that his death sentence was imposed in violation of the eighth and fourteenth amendments because the jury was not given a narrowing construction of the statutory aggravating factor requiring that the murder of a child be the result of "exceptionally brutal or heinous behavior indicative of wanton cruelty"; (11) that his death sentence was imposed in violation of the eighth and fourteenth amendments because the jury was allowed to consider "any other reason supported by the evidence why the defendant should be sentenced to death"; (12) that the Illinois death penalty statute is violative of the eighth and fourteenth amendments because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation; and (13) that the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences.

## A

Defendant's first three arguments all involve defendant's claim that he was allowed to plead guilty to counts of knowing murder and intentional murder, where the trial court lacked subject matter jurisdiction for those charges. From this claim, defendant argues

that his guilty plea should be vacated because his counsel was ineffective for failing to move to dismiss the knowing and intentional murder counts on jurisdictional grounds and for allowing the defendant to plead guilty to those counts. Defendant also argues that his guilty plea should be vacated because the court did not admonish him that he could not be convicted of knowing or intentional murder and because his trial counsel failed to object to the defective admonishment. While defendant correctly asserts that the trial court lacked subject matter jurisdiction over any knowing or intentional murder counts, defendant's claim that he was charged with and pleaded guilty to those counts is wholly unsupported by the record.

Criminal jurisdiction is controlled by section 1—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 1—5). Defendant does not dispute that Illinois has jurisdiction to prosecute him for felony murder, acknowledging that the statute confers jurisdiction on the basis that the underlying kidnapping occurred in Illinois. (Ill. Rev. Stat. 1991, ch. 38, par. 1—5(b).) However, defendant asserts that he was not only charged with felony murder under section 9—1(a)(3) (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(3)), but also with separate counts of intentional murder under section 9—1(a)(1) (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1)) and knowing murder under section 9—1(a)(2) (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(2)). Defendant argues that he could not be subject to prosecution for knowing or intentional murder because no element of those offenses occurred wholly or partly within the State of Illinois. (See Ill. Rev. Stat. 1991, ch. 38, pars. 1—5(a)(1), (b).) We agree with defendant that he may not be prosecuted for intentional or knowing murder in Illinois; however, no such charges were brought against him.

In rejecting defendant's disingenuous claim that he was charged with knowing and intentional murder, we need go no further than the four corners of the charging instruments. Defendant was initially charged by information. That instrument charged defendant with first degree murder in violation of section 9—1(a)(3) (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(3)), the felony murder provision. That instrument further stated that the basis for the charge was that defendant strangled Kahla Lansing while committing a forcible felony, kidnapping.

Subsequently, defendant was charged by a grand jury indictment. That instrument also charged defendant with felony murder pursuant to section 9—1(a)(3) (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(3)). The indictment further set forth the basis for seeking the death penalty pursuant to sections 9—1(b)(6) and 9—1(b)(7). Specifically, that indictment stated:

"On or about September 28, 1991 through September 29, 1991, JEFFREY D. RISSLEY, Defendant, who was 28 years of age, in violation of Ill. Rev. Stat., Ch. 38, Sec. 9—1(a)(3), committed the offense of FIRST DEGREE MURDER (Felony Murder), in that said defendant committed a forcible felony in Bureau County, Illinois, Kidnapping, in violation of Ill. Rev. Stat., Ch. 38, Sec. 10—1(a)(1), in that said defendant knowingly and secretly confined Kahla J. Lansing, a child six years of age, against her will, and which said forcible felony of Kidnapping was continuous and ongoing from the time of the initial secret confinement in Bureau County, Illinois, and during the commission of said forcible felony of Kidnapping, the defendant knowingly and without lawful justification performed acts which caused the death of Kahla J. Lansing in that the defendant strangled Kahla J. Lansing; In performing the said acts which caused the death of said Kahla J. Lansing, the defendant acted with the intent to kill Kahla J. Lansing or with the knowledge that his said acts created a strong probability of death or great bodily harm to Kahla J. Lansing, and Kahla J. Lansing was so killed in the course of and the defendant was then committing the offense of Aggravated Kidnapping for

which the defendant may be sentenced to death pursuant to Ill. Rev. Stat., Ch. 38, Sec. 9—1(b)(6); Said death of Kahla J. Lansing, a child under twelve years of age, resulted from exceptionally brutal or heinous behavior by the defendant indicative of wanton cruelty for which the defendant may be sentenced to death pursuant to Ill. Rev. Stat., Ch. 38, Sec. 9—1(b)(7)."

Defendant does not claim that this instrument charged him with intentional murder. Instead, defendant asserts that an amendment to that indictment "added" counts of knowing and intentional murder. However, the sole change in the amended indictment was the addition of language specifying the location of the murder. Specifically, "at a location in Jackson County, Iowa." Neither the initial grand jury indictment nor the amended indictment made any reference to intentional murder under section 9—1(a)(1) or knowing murder under section 9—1(a)(2).

We also note that defendant's trial attorney filed a pretrial motion to dismiss the murder charge against defendant based on lack of jurisdiction. That motion stated that "defendant is charged in the Amended Count II of the indictment with felony murder pursuant to Chapter 38, Illinois Revised Statutes Section 9—1(a)(3)." Apparently aware that his trial counsel was not confused concerning the charges in the indictment, defendant now argues that his counsel's omission in failing to discuss the alleged knowing and intentional murder counts amounted to ineffective assistance of counsel. However, any mystery regarding why defendant's trial counsel failed to argue for the dismissal of the alleged counts of knowing and intentional murder is more readily explained by the fact that the indictment contained no such charges.

Last, defendant argues that he pleaded guilty to knowing and intentional murder. Defendant's claim arises from the language of the amended indictment

that was read into the record by the trial judge at the hearing on defendant's plea. In addition to the charge of felony murder, the trial court also read that portion of the amended indictment that contained the basis for seeking the death penalty pursuant to sections 9—1(b)(6) and 9—1(b)(7). Section 9—1(b)(6) provides that a defendant convicted of felony murder on the basis of certain felonies is eligible for the death penalty where the defendant acted with intent to kill or with knowledge that the acts created a strong probability of death or great bodily harm. Defendant argues that by reading this portion of the indictment during the hearing on defendant's plea, defendant pleaded guilty to charges of intentional and knowing murder.

In rejecting defendant's argument, we first note that setting forth the aggravating factors in the charging instrument is the preferred method of putting the defendant on notice concerning the State's basis for seeking the death penalty. (See *People v. Davis* (1983), 95 Ill. 2d 1, 28-29.) In addition, such statutory aggravating factors are not elements of the crime charged. (*Davis*, 95 Ill. 2d at 29.) Defendant's plea of guilty to the charged crime of felony murder is not transformed into a plea of guilty to the statutory aggravating factors by their mere existence in the indictment.

Furthermore, the record shows that there was no confusion at defendant's plea hearing concerning the nature of the murder charge at issue. At defendant's plea hearing, the trial court blankly stated that defendant was charged with felony murder pursuant to section 9—1(a)(3). The trial court asked the defendant repeatedly whether he understood the nature of "*the* offense" in that count of the indictment. Defendant responded that he understood. Defendant's attorney also indicated that he had discussed "*the* offense" with defendant and defendant understood the nature of "*that*

offense." We therefore reject defendant's contention that he was allowed to plead guilty to knowing and intentional murder.

B

Defendant's fourth argument on appeal is that his death sentence should be vacated because the offense of aggravated kidnapping was used as a double enhancement. Defendant's argument is that an impermissible double enhancement occurred because he was convicted of felony murder, with aggravated kidnapping as the predicate felony, and he was also found eligible for the death penalty because the murder occurred during the course of an aggravated kidnapping. Defendant's claim is without merit.

We first note that, in an effort to put forth a cognizable argument, defendant has mischaracterized the predicate felony that was the basis for his felony murder conviction. Defendant asserts that the predicate felony for his felony murder conviction was the *aggravated* kidnapping of Kahla Lansing. However, the amended indictment did not charge aggravated kidnapping as the predicate felony. (See Ill. Rev. Stat. 1991, ch. 38, par. 10—2.) Instead, the amended indictment charged defendant with felony murder predicated on simple kidnapping. (See Ill. Rev. Stat. 1991, ch. 38, par. 10—1.) Defendant was charged with aggravated kidnapping in a separate count. As such, defendant's argument that an impermissible double enhancement occurred based on the charge of aggravated kidnapping being used as a predicate felony is not supported by the record.

In his reply brief, defendant acknowledges that his argument was premised on the faulty assumption that he was charged with aggravated kidnapping as the predicate felony for felony murder. Nonetheless, defendant argues an impermissible double enhancement still exists based on the victim's age. According to the defen-

dant, the victim's age is an element of simple kidnap- ·
ping because the statute defining that offense provides:

> "Confinement of a child under the age of 13 years is
> against his will within the meaning of this Section if such
> confinement is without the consent of his parent or legal
> guardian." (Ill. Rev. Stat. 1991, ch. 38, par. 10—1(b).)

Defendant argues that the victim's age is therefore a
necessary element of simple kidnapping because without
the victim's age, the record would not support a finding
that defendant's confinement of Kahla was "against her
will." Defendant then argues that the victim's age was
again used to support the aggravated kidnapping felony
necessary for death penalty eligibility under section
9—1(b)(6). Thus, defendant persists in his argument that
a double enhancement occurred whether the predicate
felony was simple kidnapping or aggravated kidnap-
ping.

Without commenting on whether this reasoning is
creditable, we will address defendant's double-
enhancement claim. It is a general rule of construction
regarding criminal sentencing schemes that a factor im-
plicit in the offense for which defendant is convicted
cannot be used as an aggravating factor at sentencing.
(*People v. Ferguson* (1989), 132 Ill. 2d 86, 97.) This double-
enhancement rule is premised on the assumption that
the legislature considered the factors inherent in the of-
fense in determining the appropriate range of penalties
for that offense. See *Ferguson*, 132 Ill. 2d at 97, citing
*People v. White* (1986), 114 Ill. 2d 61, 66.

However, this is merely a rule of statutory construc-
tion. (*Fitzsimmons v. Norgle* (1984), 104 Ill. 2d 369, 374.)
Where the legislature clearly intends to enhance the
penalty based on some aspect of the crime, and such an
intention is clearly expressed, there is no prohibition.
(See *Ferguson*, 132 Ill. 2d at 99; *Fitzsimmons*, 104 Ill. 2d
at 374.) In determining whether the legislature intended
a double enhancement, we look to the statute itself as

the best indication of legislative intent. (*Ferguson*, 132 Ill. 2d at 97.) Where the statutory language is clear and unambiguous, our duty is to enforce the law as enacted without resort to further principles of statutory construction. *County of Du Page v. Graham, Anderson, Probst & White* (1985), 109 Ill. 2d 143, 151.

The unambiguous statutory language provides that a defendant is eligible for the death penalty if the defendant, either alone or in conjunction with another, intentionally or knowingly commits a murder during the commission of certain enumerated felonies, including aggravated kidnapping. (See Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6).) As the statute is not ambiguous, there is no reason to resort to further principles of statutory construction. We find that the legislature intended to make a defendant eligible for the death penalty where the requirements of section 9—1(b)(6) are satisfied.

We also note that the reasoning that supports the double-enhancement rule of statutory construction does not apply in this context. As stated, the double-enhancement rule is premised on the assumption that the legislature considered the factors inherent in the offense in determining the appropriate range of penalties for that offense. (See *Ferguson*, 132 Ill. 2d at 97, citing *White*, 114 Ill. 2d at 66.) For this reason, this court has found that the legislature did not intend that a defendant convicted of aggravated battery of a child should have his sentence further enhanced under a separate sentencing scheme because of the victim's age. (*White*, 114 Ill. 2d at 66.) Similarly, this court has allowed death penalty eligibility under section 9—1(b)(6) only where separate acts of bodily harm supported the aggravated felony and caused the death. (*People v. Kokoraleis* (1989), 132 Ill. 2d 235, 279-80; *People v. Terrell* (1989), 132 Ill. 2d 178, 222; *People v. Ramey* (1992), 151 Ill. 2d 498, 551.) This is because some bodily injury is implicit in the of-

fense of murder. Therefore, we presume that the legislature intended to require some separate bodily injury to support the aggravated felony before enhancing a defendant's murder sentence with a determination of death penalty eligibility.

The assumption that the legislature did not intend a more severe penalty based on factors inherent in the offense simply does not apply to the very practice of predicating death penalty eligibility on murders that occur during certain felonies. Such an assumption is inconsistent with the apparent rationale underlying section 9—1(b)(6) "to deter further acts of violence during the commission of those felonies." (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 67.) Moreover, accepting defendant's argument would eliminate the very practice of basing death penalty determinations on the commission of a murder in the course of another felony. This is clearly contrary to the intent of the legislature.

The cases cited by defendant do not support his argument that he suffered a double enhancement based on the victim's age, resulting in his eligibility for the death penalty under section 9—1(b)(6). (See, *e.g.*, *Kokoraleis*, 132 Ill. 2d 235; *Ramey*, 151 Ill. 2d 498; *Terrell*, 132 Ill. 2d 178; *People v. Phillips* (1989), 127 Ill. 2d 499.) Underlying these cases is the belief that the legislature did not intend that a defendant should have his felony charge aggravated by the same solitary act that also caused the victim's death. Viewed in this light, defendant's reliance on these cases is misplaced.

In determining whether an impermissible double enhancement has occurred under section 9—1(b)(6), this court has suggested that the same acts which served as the basis for the underlying felony may not also cause the victim's death. (*Kokoraleis*, 132 Ill. 2d at 279.) For example, in *Kokoraleis*, the defendant argued that an impermissible double enhancement occurred where the

same bodily harm supported the charge of aggravated kidnapping and also caused the victim's death. In rejecting the argument, this court concluded that "the evidence \*\*\* supports the conclusion that the victim suffered multiple acts of physical harm, and that there was not a necessary identity between the acts causing death and the acts constituting the physical harm that was an element of the aggravated kidnapping." *Kokoraleis*, 132 Ill. 2d at 280.

Similarly, in *Ramey*, the defendant argued that the act of stabbing his victim with a knife could not both serve as a basis for his conviction for a home invasion and support his eligibility under section 9—1(b)(6). The court rejected defendant's argument, finding that the victim suffered injuries in addition to those that caused the death and these injuries were sufficient to support the home invasion charge. *Ramey*, 151 Ill. 2d at 551; see also *People v. Scott* (1992), 148 Ill. 2d 479, 561-62; *Terrell*, 132 Ill. 2d at 222.

Defendant cannot argue that his "single solitary act constituted both the sole action causing death and the single activity which raised a kidnapping to aggravated kidnapping." (See *Phillips*, 127 Ill. 2d at 540-41.) Instead, the reason defendant's kidnapping charge was raised to an aggravated kidnapping charge is the victim's tender age. (See Ill. Rev. Stat. 1991, ch. 38, par. 10—2(a)(2).) The age of the victim has nothing to do with the acts that caused her death. For this reason, we find that the cases relied upon by defendant are inapposite. We therefore hold that a victim's age may be used both to establish a predicate felony and also to establish eligibility under section 9—1(b)(6).

C

Defendant next argues that it was plain error for the court and the parties to indicate at the eligibility phase that defendant's plea of guilty to first degree mur-

der established the mental state required to be proved beyond a reasonable doubt under section 9—1(b)(6). Defendant acknowledges that his trial attorney failed to object to the statements and also did not include the issue in a post-trial motion. As such, the issue is waived. (*People v. Enoch* (1988), 122 Ill. 2d 176.) Nonetheless, defendant urges us to review this issue as plain error. (134 Ill. 2d R. 615(a).) We may review an alleged error not properly preserved where "the evidence is closely balanced or the error is of such magnitude that the commission thereof denies the accused a fair and impartial trial or sentencing hearing." (*People v. Young* (1989), 128 Ill. 2d 1, 47.) Because the remarks, as defendant characterizes them, could have had the effect of denying defendant a fair sentencing hearing, we review defendant's claim.

Defendant claims that statements by the court and the parties indicated to the jury that defendant was eligible for the death penalty under section 9—1(b)(6), solely on the basis of his guilty pleas. As we already determined, defendant was charged and pleaded guilty to only felony murder. As such, defendant, on the basis of his plea to that charge, did not admit the requisite mental state necessary for eligibility under section 9—1(b)(6). (*Cf. People v. Pugh* (1993), 157 Ill. 2d 1 (finding counsel ineffective for stipulating to death penalty eligibility on section 9—1(b)(6) grounds where defendant was only convicted of felony murder).) However, defendant's argument that he was found eligible under section 9—1(b)(6) based solely on his guilty plea is overwhelmingly contradicted by the record.

First, defendant contends that, during *voir dire,* the trial court told the jury that defendant had already pleaded guilty to the "knowing" murder of Kahla Lansing. However, that portion of the record cited by the defendant does not support defendant's contention.

Instead, that portion of the record contains nothing more than the judge reading to the jury the murder charge from the amended indictment. The judge also correctly stated that defendant was convicted of this charge on the basis of his plea. The judge did not read that portion of the indictment that set forth the aggravating factors under which the State was seeking death penalty eligibility. In addition, the judge repeatedly stated that defendant's murder conviction did not automatically require that defendant be sentenced to death. Nothing in the entire record supports defendant's assertion that the trial judge relieved the State of its burden of proving the mental element required by section 9—1(b)(6). Moreover, we note that the jury was properly instructed concerning the State's burden of proving the necessary elements of section 9—1(b)(6).

Second, defendant argues that the prosecutor told the jury that defendant was eligible for the death penalty solely on the basis of his guilty plea. Specifically, defendant complains that the prosecutor told the jury that defendant was convicted of knowing murder and that defendant "was already convicted of the very offense that's at issue in the eligibility phase." However, defendant mischaracterizes the record.

The prosecutor did not state that defendant was convicted of knowing murder, but merely read the amended indictment. As we have already determined, the amended indictment charged defendant only with felony murder. In addition, the prosecutor's comment that defendant "was already convicted of the very offense that's at issue in the eligibility phase" was not improper. Read in context, the prosecutor was referring to the fact that defendant was already convicted of aggravated kidnapping, which is an element that needed to be proved for eligibility under section 9—1(b)(6). After reading the indictment, the prosecutor also correctly stated:

"We have to show that Kahla Lansing was actually killed by this defendant. That he actually performed the act. We have to show that in performing the act which caused the death of Kahla Lansing, that defendant, Jeffrey Rissley, acted with the intent to kill Kahla J. Lansing, or acted with the knowledge that his acts created a strong probability of death or great bodily harm to Kahla J. Lansing."

The prosecutor never stated that defendant was eligible for the death penalty solely on the basis of his guilty plea. In contrast, the prosecutor presented overwhelming evidence that the murder was committed with the requisite mental state. We therefore reject defendant's argument that the prosecutor used defendant's guilty plea as the sole basis for eligibility under section 9—1(b)(6).

Third, defendant complains about a statement made by his trial counsel during closing argument at the eligibility phase. At one point, defendant's trial counsel stated:

"Within five minutes of the close of [the prosecutor's] opening statement, we were by Jeff Rissley's pleas, eligible for death. Within five minutes we were eligible for death and the state was guaranteed to go to phase II. I told you we pled guilty to murder and we stipulated to the fact that we pled to Aggravated Kidnapping. That is factor number one."

After apparently conceding eligibility under section 9—1(b)(6), defense counsel then proceeded to vigorously attack eligibility under section 9—1(b)(7). We agree that this isolated comment improperly implies that defendant was eligible for the death penalty based solely on the basis of his plea. However, after looking at defense counsel's comments as a whole, we find that there was no plain error.

Comments in closing arguments must be considered in context. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175.) We note that at an earlier point in his closing argument, defense counsel had fully described the require-

ments for eligibility under section 9—1(b)(6). At this time, defense counsel included the requirement that defendant actually have killed Kahla Lansing and that "in performing the acts which caused [her death], the defendant acted with the intent to kill or with the knowledge that his acts created a strong probability of death or great bodily harm." We also note that both the court and the prosecution properly advised the jury concerning the necessary elements for eligibility under section 9—1(b)(6). Therefore, defense counsel did not relieve the State of its burden of proving the requisite mental state under section 9—1(b)(6).

Moreover, defense counsel's apparent concession regarding eligibility under section 9—1(b)(6) came in the context of mounting a more pointed challenge against eligibility under section 9—1(b)(7). The evidence concerning defendant's eligibility under section 9—1(b)(6) was overwhelming. Defense counsel was placed in the difficult position of representing a defendant who not only had pled guilty to felony murder, but also had made numerous statements that he personally strangled the victim. Indeed, this court has noted in the guilt phase that "[i]n situations where there is overwhelming evidence of guilt and no defense, if counsel contests all the charges he is liable to lose credibility with the trier of fact when it comes to charges where a legitimate defense exists." (*People v. Johnson* (1989), 128 Ill. 2d 253, 270; see also *People v. Ganus* (1992), 148 Ill. 2d 466, 473-74.) Similarly, it appears that defense counsel merely attempted to shift focus from the section 9—1(b)(6) aggravating factor, in order to mount a more credible challenge against eligibility under section 9—1(b)(7).

With these considerations in mind, we reject defendant's argument that his counsel's comment amounted to plain error. Under the plain error doctrine, if the error is of such magnitude that defendant has been denied

a fair capital sentencing hearing, waiver is not applicable. (*People v. Barrow* (1989), 133 Ill. 2d 226, 274-75.) Given the overwhelming evidence presented by the prosecution, defense counsel's isolated comment did not affect fairness of the sentencing hearing. Consequently, we find any error waived.

### D

Defendant next contends that his guilty plea was not knowingly and voluntarily entered because the trial court's admonishments were defective. Specifically, defendant asserts that the trial court failed to admonish that, by pleading guilty to knowing and intentional murder and aggravated kidnapping, defendant was admitting his eligibility for the death penalty under section 9—1(b)(6). We have already determined that defendant did not plead guilty to knowing or intentional murder. Therefore, defendant was not eligible for the death penalty based solely on his guilty pleas to felony murder and aggravated kidnapping because the State must still prove a culpable mental state. (*People v. Rogers* (1988), 123 Ill. 2d 487, 518.) As such, defendant's argument is without merit.

We also note that defendant was thoroughly admonished regarding the consequences of his guilty pleas. The court repeatedly admonished defendant that he could be sentenced to death. The court further explained the nature of the issues at both phases of the capital sentencing hearing. Defendant stated that he understood the possible sentences and had discussed them at length with his counsel. Defendant's counsel also stated that he had discussed the possible penalties with defendant at length and that defendant understood those penalties. We therefore reject defendant's argument that the trial court's defective admonishments prevented defendant from knowingly entering his guilty plea.

## E

Defendant's next two challenges to his death sentence involve the selection of the jury for the capital sentencing hearing. First, defendant argues that he was denied his right to a fair and impartial jury where the trial court refused to excuse venireperson Swinney for cause. Second, defendant argues that he was denied his right to a fair and impartial jury where the trial court excused venireperson Gallick for cause. We find that the trial court did not abuse its discretion concerning either potential juror.

### Venireperson Swinney

Defendant argues that he was denied his right to a fair and impartial jury because the trial judge refused to excuse venireperson Swinney for cause. Defendant complains that venireperson Swinney overheard a prejudicial remark made by another potential juror during *voir dire*. Specifically, venireperson Deischer was asked whether he would impose the death penalty without regard to the evidence submitted at the hearing. In response, Deischer stated that he had already made up his mind that the defendant should be sentenced to death. When pressed for a justification concerning his inability to rest his decision on the evidence presented at trial, Deischer stated that "the victim did not get to come to court to decide if she wanted to die."

The other three members of the venire panel heard Deischer's responses to the court's questions. Defense counsel moved to strike the entire four-person panel for cause. The trial court granted defendant's motion to strike venireperson Deischer for cause, but reserved the decision regarding the remaining three members of the panel. At this time, court was adjourned for the day.

The following day, the court heard argument regarding whether to strike the three remaining venire members from the panel that overheard Deischer's remarks. Defense counsel argued that Deischer's state-

ment was so prejudicial that it tainted the entire panel. Upon the agreement of both the prosecution and defense, the judge then called in each of the remaining potential jurors from the panel and individually questioned them. The judge asked whether they could disregard Deischer's comment and decide the case based only on the law and the evidence presented in the hearing. Based on the responses of the potential jurors, the trial judge ruled that the remaining members of the panel were able to serve despite having overheard Deischer's comments. The trial judge therefore denied defendant's motion to strike the three remaining venirepersons from the panel. Venireperson Swinney was among those who overheard the remark. Swinney later became the foreperson of the jury.

Defendant argues that the trial judge erred in refusing to excuse Swinney for cause. We note that the trial judge individually questioned Swinney to determine the effect of having overheard the complained-of remark. The trial judge specifically found that, based on her responses to his questions and her demeanor, she could serve as an impartial juror despite having overheard the remark. The decision to allow a challenge of a prospective juror for cause rests within the sound discretion of the trial court. (*People v. Seuffer* (1991), 144 Ill. 2d 482, 502.) From our review of the record, we cannot say that the trial judge abused his discretion in refusing to exclude Swinney for cause.

### Venireperson Gallick

Venireperson Gallick was also questioned during *voir dire*. During questioning by the court, Gallick testified that he was Catholic and therefore "never really believed in capital punishment." The court then asked whether Gallick would automatically vote against imposition of the death penalty without regard to the evidence. Gallick responded in the affirmative. However,

upon further questioning by the court, Gallick indicated that he misunderstood the question and would not automatically vote against the death penalty without hearing the evidence. When questioned by defense counsel, Gallick reiterated that he could decide whether to impose the death penalty based only on the evidence presented at the hearing.

Venireperson Gallick was then questioned by the prosecution. Gallick agreed with the prosecutor that his religious upbringing formed his attitudes and therefore would have "an effect" on his decision. However, Gallick went on to state that although it would be difficult, he believed he could set those feelings aside and decide the punishment based only on the facts at trial. When pressed by the prosecution, Gallick admitted that his religious beliefs could impair his ability to return a verdict of death to a substantial degree.

The trial judge then asked additional questions of Gallick. The trial judge asked Gallick whether his religious beliefs would impair his ability to decide whether to impose the death penalty based only on the law and the facts presented. Gallick responded "yes." The trial judge further twice asked Gallick whether his heart may prevent a verdict that he felt in his head was justified by the law and the evidence. Gallick responded "yes" to the first formulation of the question and "yes, it might" to the second. At this time, the trial judge granted the prosecution's motion to strike Gallick for cause.

A prospective juror may not be excused for cause simply because the person expresses general conscientious or religious scruples against the imposition of the death penalty. (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777-78; *People v. Tenner* (1993), 157 Ill. 2d 341, 362.) Instead, a prospective juror should be removed for cause in such

cases only where "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526.) In making this determination, a trial judge need not follow a "set catechism" in posing questions. (*People v. Szabo* (1983), 94 Ill. 2d 327, 354.) In addition, potential jurors need not express themselves with "meticulous preciseness" and their comments should be judged as a whole. (*Szabo*, 94 Ill. 2d at 354.) On review, we give deference to the trial judge, who is in a "superior position *** to gauge the meaning of the prospective juror's responses." *People v. Emerson* (1987), 122 Ill. 2d 411, 439.

With these considerations in mind, we cannot find that the trial judge abused his discretion in excusing venireperson Gallick for cause. Although equivocal at times, Gallick stated that his religious beliefs would interfere with his ability to follow the law to a substantial degree. Moreover, Gallick's responses to the trial judge's questions intimate an inability to perform the necessary functions of a capital juror. Given that the trial judge was in a superior position to gauge what Gallick was intending to convey, we cannot find that the trial judge erred in excluding him.

### F

Defendant next argues that he was denied a fair capital sentencing hearing by the introduction of six crime scene and autopsy photographs. At the eligibility stage of defendant's capital sentencing hearing, the prosecution introduced people's exhibits 9, 10, 12, 14, 15, and 16. Each of these photographs depict Kahla with an electrical cord wrapped around her neck or with the cord removed to show the ligature marks about the

neck. The photographs also show evidence of insect infestation in the facial area. The trial court admitted these photographs over defendant's objection.

Defendant argues that these photographs were not relevant and therefore improperly admitted. Defendant further argues that any probative value of the photographs was outweighed by prejudice to the defendant. Defendant also argues that several of the photographs were cumulative and that less prejudicial photographs were available to prove the same facts. The State argues the photographs were relevant to defendant's intent and to corroborate his confession. We note that the decision to admit photographs into evidence is left to the discretion of the trial court, whose decision will not be overturned absent an abuse of discretion. *People v. Lucas* (1989), 132 Ill. 2d 399, 439; *People v. Simms* (1991), 143 Ill. 2d 154, 175.

We first address defendant's argument that the photographs at issue were not relevant and therefore inadmissible. The photographs were admitted during the first phase of the defendant's capital sentencing hearing. The purpose of the first stage of the capital sentencing hearing is to allow the jury to determine defendant's eligibility for the death penalty on the basis of a statutory aggravating factor. Here, the State was attempting to prove defendant's eligibility under sections 9—1(b)(6) and 9—1(b)(7) (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(b)(6), (b)(7)). Therefore, any evidence having a tendency to prove an element of either statutory aggravating factor is relevant.

In determining whether the defendant was eligible under section 9—1(b)(6), the sentencing jury had to decide whether the defendant intended to kill Kahla Lansing or acted with knowledge of a strong probability that his acts would cause her death. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6).) The photographs depict Kahla

with the electrical cord wrapped around her neck and with the electrical cord removed to show the ligature marks. As such, the photographs are relevant to a determination of defendant's mental state at the time of the murder because they illustrate the manner in which the death occurred and the force that was used. (See *Simms,* 143 Ill. 2d at 176.) Furthermore, we note that the photographs corroborate the details of defendant's confessions, evidence which is also relevant to defendant's mental state.

The photographic evidence at issue was further relevant to defendant's eligibility for the death penalty under section 9—1(b)(7) (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(7)). In determining whether the defendant was eligible under section 9—1(b)(7), the sentencing jury had to determine whether the death resulted from "exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(7).) Again, we find that the photographs were relevant to this inquiry by illustrating the manner in which the death occurred and the force used. We therefore reject defendant's challenge to the relevancy of the crime scene and autopsy photographs.

Defendant further argues that, even if the photographs were relevant, the trial court abused its discretion in admitting them. Specifically, defendant argues that the photographs were cumulative and that any probative value of the photographs was outweighed by their prejudicial effect on the jury. Defendant notes that the photographs showed the decomposition and insect infestation of the victim's face that occurred during the 13 days before the body was recovered. Defendant further notes that other photographs were admitted that showed the electrical cord and ligature marks, but did not show the decomposition of the victim's face. Defendant therefore argues that the trial court abused its discretion in admitting the photographs.

In general, photographs of a victim are admissible where they are relevant to establish any material fact. (*People v. Shum* (1987), 117 Ill. 2d 317, 353-54.) Furthermore, such photographs are admissible despite the fact that they may be gruesome or inflammatory or even "disgusting." (*Shum*, 117 Ill. 2d at 353, quoting *People v. Lindgren* (1980), 79 Ill. 2d 129, 143.) Photographs that are not relevant but are instead introduced solely to inflame the jury are not admissible. See *People v. Brisbon* (1985), 106 Ill. 2d 342, 371-72; *People v. Davis* (1983), 97 Ill. 2d 1, 29.

Applying these considerations, we find the admission of the photographs was not an abuse of discretion. Despite some gruesome aspects of the photographs, they were relevant to proving defendant's eligibility under sections 9—1(b)(6) and 9—1(b)(7). Specifically, the photographs were evidence of defendant's mental state at the time of the murder, the manner of the murder, and the force used. The photographs also corroborated defendant's confessions and the testimony of the State's witnesses. Thus, we cannot say that they were introduced solely to inflame and prejudice the jury.

Defendant also argues that several of the photographs were cumulative and that less prejudicial photographs were available to prove the same facts. The decision to admit photographic evidence is for the trial court, whose decision will not be overturned absent an abuse of discretion. (*Lindgren*, 79 Ill. 2d at 143.) We note that four of the photographs were taken at the autopsy room and two at the crime scene. Further, the photographs were taken from different angles and showed different aspects of the crime, including: the placement of the electrical cord, the ligature marks, and the placement and condition of the body at the crime scene. We have considered defendant's arguments and find them to be without merit.

## G

Defendant's next two arguments involve vagueness challenges to the Illinois death penalty statute. Defendant first argues that his death sentence was imposed in violation of the eighth and fourteenth amendments because the jury was not given a narrowing construction of section 9—1(b)(7). That section provides that a person convicted of murder is eligible for the death penalty if "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(7).) Relying on *People v. Lucas* (1989), 132 Ill. 2d 399, and *People v. Tye* (1990), 141 Ill. 2d 1, defendant argues that the trial court should have instructed the jury that eligibility under section 9—1(b)(7) requires that the murder involve prolonged pain, torture, or premeditation. Defendant reasons that the language of section 9—1(b)(7) is unconstitutionally vague because it fails to adequately channel the discretion of the sentencer without this limiting construction. See *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853.

We first note that the defendant did not raise an objection to the jury instructions defining eligibility under section 9—1(b)(7). Further, when the jury sought guidance on the meaning of two terms that are part of that aggravating circumstance, the defense proposed the clarification that was given to the jury. According to defendant's wishes, the trial judge provided the jury with the definition of "heinous" tendered by the defendant. Defense counsel also agreed to not provide any definition of the term "wanton cruelty."

A defendant may not generally challenge an instruction on appeal unless he makes a contemporaneous objection and, if appropriate, tenders an alternative instruction at trial. (*People v. Banks* (1994), 161 Ill. 2d 119, 146; *People v. Perez* (1985), 108 Ill. 2d 70, 92; *People*

*v. Lewis* (1981), 88 Ill. 2d 129, 149.) We note that defense counsel did not request the limiting construction of section 9—1(b)(7) which this court approved in *Tye*.

We therefore find any error waived. Although we have previously recognized a narrow exception to the waiver rule (*People v. Easley* (1992), 148 Ill. 2d 281, 336-38; *People v. Roberts* (1979), 75 Ill. 2d 1, 10-15; 145 Ill. 2d R. 451(c)), the facts in this case, particularly defense counsel's role in proposing the response to the jury's inquiry, do not support application of the exception.

In a related argument, defendant contends that the Illinois death penalty statute is unconstitutionally vague because it allows the jury to consider "any other reason supported by the evidence why the defendant should be sentenced to death." (See Ill. Rev. Stat. 1991, ch. 38, par. 9—1(c).) This court has consistently rejected the argument that consideration of nonstatutory aggravating factors by the sentencer results in arbitrarily imposed death sentences. (*People v. Collins* (1985), 106 Ill. 2d 237, 285; *People v. Madej* (1985), 106 Ill. 2d 201, 211; *People v. Neal* (1985), 111 Ill. 2d 180, 203; *People v. Todd* (1992), 154 Ill. 2d 57, 75-76.) We decline to reexamine those cases.

### H

Last, defendant raises several general challenges to the Illinois death penalty statute (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(g)). Defendant first argues that the Illinois death penalty statute violates the eighth and fourteenth amendments because it places a burden of proof on the defendant and therefore precludes meaningful consideration of mitigation. Specifically, defendant asserts that the statute violates the eighth amendment by providing for the death penalty where evidence in mitigation is "not sufficient to preclude" it.

This court has repeatedly rejected the argument that the Illinois death penalty statute places a burden on the

defendant to prove that death is an inappropriate penalty. (*People v. Simms* (1991), 143 Ill. 2d 154, 184; *People v. Fields* (1990), 135 Ill. 2d 18, 76; *People v. Guest* (1986), 115 Ill. 2d 72, 112; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446.) In so holding, this court has determined that neither the State nor the defendant bears the burden of proof at the second stage of a capital sentencing hearing. (*Fields*, 135 Ill. 2d at 76; *People v. Olinger* (1986), 112 Ill. 2d 324, 351; *People v. Owens* (1984), 102 Ill. 2d 88, 115.) We find the issue well settled and decline defendant's invitation to reexamine it.

Defendant next argues that the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily and capriciously imposed death sentences. Defendant does not advance any specific argument in support of his position, but instead asks us to reconsider prior decisions on this issue. We note that this court has repeatedly rejected such challenges. (*People v. Ashford* (1988), 121 Ill. 2d 55, 90; *People v. Perez* (1985), 108 Ill. 2d 70, 95-98; *People v. Albanese* (1984), 104 Ill. 2d 504, 539-42.) Further, this court has also rejected the argument that various challenged aspects of the death penalty statute, in combination, invite arbitrarily imposed death sentences. (*Simms*, 143 Ill. 2d at 185; *Tenner*, 157 Ill. 2d at 390.) Defendant has presented no reason to reexamine those cases.

## VI. Conclusion

For the reasons stated, the judgment of the circuit court of Bureau County is affirmed. The clerk of this court shall enter an order setting Wednesday, September 13, 1995, as the date on which the sentence of death, entered in the circuit court of Bureau County, is to be carried out. The defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk shall send a certified copy of the

mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Affirmed.*