Docket No. 76086--Agenda 2--November 1995.

   THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. FRANK REDD, Appellant.

                         Opinion filed May 23, 1996.

                                       

     JUSTICE MILLER delivered the opinion of the court:

     Following a jury trial in the circuit court of Cook County, the

defendant, Frank Redd, was convicted of the murder and the rape of Aretha and

Leola Bea. At a separate sentencing hearing, the same jury found the

defendant eligible for the death penalty. The jury further determined that

there were no mitigating circumstances sufficient to preclude imposition of

that sentence. The judge sentenced defendant to death for the murders and to

a term of 60 years' imprisonment for each of the rape convictions. The

defendant's execution has been stayed pending direct review by this court.

Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the

reasons that follow, we affirm the judgment of the circuit court.

     In 1985, at the close of defendant's first jury trial on the offenses

charged here, he was convicted of two counts of murder and two counts of rape

and sentenced to death. On direct appeal, this court reversed defendant's

conviction and sentence and remanded the cause to the circuit court for a new

trial and sentencing hearing. People v. Redd, 135 Ill. 2d 252 (1990). On

remand, the defendant waived his right to the assistance of counsel and

proceeded pro se at both the trial and the capital sentencing hearing.

Against defendant's wishes, a public defender was assigned to be present in

the courtroom as standby counsel throughout both phases of defendant's trial.

     Defendant's convictions stem from events that occurred in the early

morning hours of March 4, 1984. Evidence at trial revealed that on March 3,

1984, Ruby Bea went shopping and left her three daughters, Aretha, age five,

Leola, age three, and Robertrese, age two, in the care of defendant's mother,

Earceaner Washington, at Mrs. Washington's apartment. When Ruby returned,

defendant and several other acquaintances were present at Mrs. Washington's.

Ruby stayed for awhile and visited. That evening, at Ruby's request,

defendant accompanied Ruby and her three children to Ruby's apartment located

at the rear of the third floor of 6712 South Halstead in Chicago.

     Defendant was with Ruby in her apartment when later that evening all

three children went to sleep in one bed, fully clothed. After the children

were asleep, Ruby and defendant left the children and went downstairs to the

second-floor apartment where defendant's sister, Gloria Stewart, and Ruby's

brother-in-law, Leslie Bea, lived. When Ruby went downstairs, she did not

lock her apartment door because she knew that the street-level entrance to

the building was locked. In Gloria's apartment, everyone sat at the table

talking, except defendant, who paced the floor. Defendant left briefly, but

soon returned and began pacing again.

     After defendant left a second time Ruby looked down the steps to see

that the street-level entrance remained locked. She did not see defendant as

she looked down the stairs. She assumed he had gone into one of the other

apartments in the building because insufficient time had passed for someone

to leave the building. Ruby was aware that defendant knew the occupant of the

apartment across the hall from Gloria's.

     After approximately one hour, defendant returned to Gloria's apartment

and went directly to the bathroom. At trial, Leslie Bea testified that when

defendant returned the second time he had dark red spots on his shirt and red

spots on his hand. Defendant conversed with Gloria and Leslie in the bathroom

and then left again.

     Ruby remained with Gloria and Leslie, and then later returned to her

third-floor apartment. When Ruby entered her apartment, she went to the

bedroom. She believed she saw two of her daughters, but not Aretha, sleeping

in the bed. As she looked for Aretha, Ruby saw blood on the kitchen floor by

the back door. Ruby ran down to the second floor, seeking Gloria's help to

find Aretha. After asking for help, but without finding Aretha, Ruby returned

to her apartment. When she went back into the bedroom to check on Leola and

Robertrese, Ruby discovered that Leola was dead.

     Betty Gray, the occupant of the apartment opposite Ruby's apartment,

looked out of her door at about 1:30 a.m. on March 4, 1984, and saw that the

door to Ruby's apartment was open. Gray entered Ruby's apartment and heard

Ruby crying. Percy Hamilton, another apartment occupant in the same building,

was with Ruby. Gray ran back to her own apartment and telephoned the police.

She then returned to Ruby's apartment, where she found Robertrese sitting

unharmed at the end of the bed. Leola was under the covers, with her mouth

open and a garment twisted around her neck. Hamilton moved Leola into the

living room and attempted resuscitation. Gray unsuccessfully tried to remove

the item from around the child's neck.

     Police arrived at Ruby's apartment at approximately 2 a.m. on March 4,

1984. When they entered they saw Leola's body on a small couch. The child was

naked from the waist down, had a cloth wrapped around her throat and had

blood coming from her vaginal area. In the dining room police found a child's

shoe, a pair of panties, a pair of small jeans and blood on a piece of

furniture. In the kitchen, the back door was ajar about 12 inches and had a

nonworking refrigerator lodged against it. Ruby testified that the door was

ordinarily secured shut with nails with the refrigerator pushed against the

door. A pane of glass was broken out of the same door and glass was scattered

on the kitchen floor.

     A police officer walked out the back door, and from the third-floor

landing saw Aretha's body lying in the back yard. The child was naked from

the waist down and had a cloth wrapped around her throat. About 10 feet from

the body was a pair of panties. Other than the footprints the police officer

made when he approached the body, no other footprints were found within a 10-

foot radius around the body.

     Lydia Booth testified that in March of 1984, she lived next door to

defendant's mother's apartment in a building approximately five blocks from

where Ruby and her family lived. At approximately 12:30 or 1 a.m. on March 4,

1984, Booth was standing on the landing, near the entrances to her and

defendant's mother's apartment. As Booth saw defendant come up the stairs,

she noticed he was wearing blue jeans with blood on them. Booth asked

defendant what had happened and defendant replied that he had fallen. He then

he went into his mother's apartment. Defendant left approximately 20 minutes

later. He wore a different pair of pants and he carried a bag. Booth asked

defendant why he had changed his clothes, but defendant did not answer. Booth

then asked defendant if he was going to the lounge where his brother worked.

Defendant replied that he was going to the lounge but "he had to make a run

first."

      Several witnesses, including people from the apartment building,

defendant, and his mother, were questioned at police headquarters on the

morning of March 4, 1984. When police first interviewed defendant, he

admitted he had been with Ruby Bea on March 3, but stated that he went home

after partying for awhile.

     After their initial interview with defendant at the police station,

police went to defendant's mother's home and recovered a jacket, a sweater

with a wet front and a pair of undershorts they found hanging in the bathroom

with the sweater. The sweater and jacket matched the description of the

clothing defendant was seen wearing at the victims' apartment building on the

evening of the offenses. After police recovered the clothing, they gave

defendant Miranda warnings. Defendant then gave police an account of his

activities on the evening of March 3 that differed from his original story,

but he continued to deny any involvement in the offenses.

     Late in the evening of the March 4, police recovered a pair of bloody

blue jeans from the dumpster in the alley behind the lounge where defendant's

brother worked. Police again advised defendant of his rights, confronted him

with the evidence and the witnesses' statements. Defendant denied any

involvement, but then stated that he remembered being alone with the three

children and that one was dead on the couch, but that was all that he could

recall.

     At approximately 9:30 p.m. that day, defendant confessed to having had

intercourse with the victims and then strangling them. Defendant wrote a

statement in his own hand that was witnessed and initialed by two assistant

State's Attorneys. Defendant also told police that he wore blue jeans during

the offenses, and identified the blue jeans that police recovered from the

dumpster as the same pants he wore on the night of the murders.

     The autopsy performed on Leola revealed 11 instances of external injury,

including a ligature impression and abrasions on the neck, abrasions on the

chest, and abrasions on the forehead. An internal exam of Leola revealed she

had an extensive laceration or tear of the posterior wall of the vagina

extending to the border with the rectum. All injuries were recent, and the

doctor who performed the autopsy determined that Leola was alive at the time

she sustained the injury to her vaginal wall. The doctor also concluded that

the cause of Leola's death was strangulation.

     The autopsy of Aretha revealed 22 evidences of external injury,

including 14 on the face. The doctor who performed the autopsy said the

injuries were recent in origin, and were consistent with someone punching

Aretha in the face. The internal exam revealed that the entrance to Aretha's

vagina was bloody, and her hymen was completely obliterated. The doctor

stated that these injuries were consistent with her being subjected to

intercourse by an adult male while Aretha was alive. The autopsy on Aretha

also revealed head trauma, most significantly a hemorrhage and a fractured

skull, consistent with her head being struck by a hard object. The doctor

concluded that Aretha died as the result of strangulation with injuries to

the brain and skull as significant contributing conditions.

     Forensic testing on semen found in Leola's vagina revealed that the

genetic markers in the semen were consistent with defendant's. No semen was

present in Aretha's vagina, but blood was present.

     Panties found at the scene and identified as Leola's were stained with

semen containing genetic markers consistent with defendant's. Blood samples

collected from the kitchen floor were consistent with Aretha's blood.

     Forensic testing revealed a semen stain on the inside fly panel of the

blue jeans recovered from the dumpster behind the lounge where defendant's

brother worked. Diffuse bloodstains on the jeans were consistent with the

blood of Leola Bea. Hair samples found in the rear pocket of the jeans were

consistent in all morphological characteristics with a hair sample taken from

the defendant after he was arrested. In addition, flakes of glass scraped

from the jeans were found to have a common origin with samples of glass taken

from the rear door window of Ruby's kitchen. Glass fragment taken from the

kitchen were marked with human blood consistent with that of Aretha and

Leola.

     A bloodstain was found on the sleeve of the sweater recovered from

defendant's mother's house, but it was too minute to determine its origin.

Clippings from defendant's fingernails tested positive for traces of blood;

however, the amount of blood was insufficient to determine the type.

     The defendant called only one witness, Howard Anderson, president of the

Midwest Association for Sickle Cell Anemia. Defendant apparently called

Anderson in an attempt to rebut forensic evidence regarding the

characteristics of samples of defendant's blood. However, Anderson's

testimony consisted only of his acknowledgement that in response to a letter

from defendant, Anderson provided defendant with literature and information

regarding certain blood characteristics.

     Defendant declined to testify on his own behalf. Before the defense

rested, the State and defendant agreed to several stipulations. The State

stipulated to the fact that blood had been withdrawn from defendant and that

in July 1992 defendant's blood sample was analyzed to determine the presence

of certain characteristics and sickle cell anemia. The State also stipulated

to the fact that defendant had been strip-searched at the police station.

     At the close of evidence, the jury returned a verdict finding defendant

guilty of the rape and murder of both Aretha and Leola Bea. Ill. Rev. Stat.

1983, ch. 38, par. 9--1(a); Ill. Rev. Stat. 1983, ch. 38, par. 11--1(a). The

following day, the matter proceeded to a capital sentencing hearing before

the same jury.

     At the first stage of the sentencing hearing, the State presented

evidence that defendant was over the age of 18 at the time of the offenses

charged. The courtroom clerk testified that the previous day's verdict forms

reflected defendant's convictions of rape and murder in this case. The jury

found defendant eligible for the death penalty on the basis of defendant's

convictions for murder of an individual under 12 years of age whose death

resulted from exceptionally brutal or heinous behavior indicative of wanton

cruelty (Ill. Rev. Stat. 1983, ch. 38, par. 9--1(b)(7)), defendant's

convictions for multiple murders (Ill. Rev. Stat. 1983, ch. 38, par. 9--

1(b)(3)), and the murder-in-course-of-felony aggravating factor (Ill. Rev.

Stat. 1983, ch. 38, par. 9--1(b)(6)).

     At the second stage of the sentencing hearing, the doctor who performed

the autopsies on Aretha and Leola testified again and described the victims'

injuries, their causes of death and his conclusions regarding the extent of

pain each victim suffered.

     The prosecution also presented evidence of defendant's prior offenses.

Iola Warren testified that in 1979 defendant strangled and stabbed her mother

and raped Iola. Geraldine Warren testified regarding the same events. Henry

Van Tholen testified that defendant stole his car in 1973, and that defendant

received a sentence of three years' probation for that offense. Renard

McCray, testified that while he and defendant were both inmates at Pontiac

Penitentiary in 1980, defendant forcibly subjected McCray to anal

intercourse, threatened to kill him, and stabbed him in the neck with a

shank. McCray acknowledged that he had a lengthy criminal record, and was

presently in custody while charges were pending against him for possession of

a stolen auto and theft.

     The State also presented certified copies of defendant's prior

convictions. The evidence established that defendant had previously been

convicted of and was sentenced to probation for burglary in 1973, theft in

1974, and sentenced to prison for grand larceny in 1976 and rape and

attempted murder in 1979.

     The State stipulated to the contents of a medical report from Pontiac

Penitentiary. The report stated that the resident (McRay) was examined on

August 30, 1980, and no objective physical evidence of anal rape was

observed. The State further stipulated to the contents of an emergency room

report regarding Geraldine Warren and offered by the defense. The date of the

report was not contained in the record, but the contents essentially did not

contradict Geraldine Warren's testimony except that the report stated she did

not know her attacker.

     Defendant declined to present witnesses in mitigation, but did make a

closing argument. At the conclusion of the sentencing hearing, the jury found

that there were no mitigating circumstances sufficient to preclude imposition

of the death penalty. In a subsequent hearing, the trial judge sentenced

defendant to death for the murders of Leola and Aretha Bea and to a term of

60 years' imprisonment for each of the rape convictions. Defendant seeks

review of his convictions and sentence in this court. Ill. Const. 1970, art.

VI, §4(b); 134 Ill. 2d Rs. 603, 609(a).

                                I. TRIAL ISSUES

                         A. Waiver of Right to Counsel

     In his first trial on the present charges, defendant was represented by

the office of the public defender. In this trial on remand, defendant

represented himself at both the guilt and sentencing phases with appointed

standby counsel from the public defender's office. The pretrial period in

this case extended over three years due largely to the defendant's voluminous

motions and his requests for continuances.

     In his initial court appearance on remand defendant told the court he

did not want the public defender to represent him, but he wished to hire a

private attorney. Approximately two weeks later defendant told the court that

he was unable to hire a private attorney and filed a motion to proceed pro

se. The judge admonished defendant of the charges against him and the

possible penalties, including the death penalty. When the judge asked

defendant whether he had been represented by counsel at his first trial,

defendant named the assistant public defenders who had previously represented

him. The judge then told defendant he had a right to counsel and a right to

appointed counsel if he was indigent. The judge warned defendant that self-

representation was unwise. Each time the judge asked defendant if he

understood, defendant answered affirmatively. Several times the defendant

interjected that he did not want the public defender to represent him and

that he or his family would be hiring a lawyer. Defendant repeated his desire

to represent himself until he hired an attorney.

     The trial judge found that defendant understood the nature of the

charges against him, the possible penalties, and his right to counsel. The

judge stated that he found that defendant had freely and intelligently waived

his right to counsel. The judge noted, however, that defendant was continuing

his efforts to hire private counsel.

     One month later, defendant's motion for substitution of judge was

granted. During the next six months, defendant appeared before several

judges, one of whom subsequently left the bench and another judge who was

temporarily assigned to the call. Defendant introduced himself as, "Frank

Redd, pro se" to each judge. Both judges questioned defendant about his pro

se status, and several times defendant told the court that he was

representing himself while he attempted to hire an attorney. Defendant was

granted numerous continuances at his request.

     When defendant's case was permanently assigned to the next judge, she

inquired about his pro se status. During the discussion, defendant told the

judge he was representing himself and was trying to hire a lawyer. In his

next court appearance, defendant told the judge he could not hire an attorney

and he told her that he "rejected the public defender." The judge advised

defendant against proceeding pro se and urged him to accept an appointed

attorney as standby counsel. The judge asked defendant about his level of

education. She also inquired who the private attorneys were that defendant

spoke with and offered to try and have one of them appointed to represent

defendant. Defendant refused to divulge the attorneys' names. The trial judge

repeatedly advised defendant against representing himself. She also told

defendant that if he did not hire a private attorney or allow the public

defender to represent him and he proceeded pro se, she would appoint standby

counsel to advise defendant. She then granted a continuance to allow

defendant to make further attempts to secure private counsel.

     During the next several months, despite the judge's admonishments

against proceeding without an attorney, defendant continually asserted his

desire to represent himself. He participated in discovery and filed numerous

motions. When the judge stated that she would appoint counsel, defendant

cited case law and advised the court that he would consider appointed counsel

as only standby counsel.

     A few months later, the judge appointed a member of the public

defender's office to consult with defendant concerning his case. Defendant

agreed to discuss with the assistant public defender the role defendant

wished counsel to assume in his case. When defendant next appeared before the

judge, the representative of the public defender's office with whom defendant

met was also present. The judge articulated the limits of standby counsel's

participation. The assistant public defender also addressed the court and

stated that he would only function as an advisor and would not actively

assist in preparing the defense. Defendant stated several more times that he

did not want a lawyer and that he wanted to represent himself. Defendant

indicated that he would need to talk to the assistant public defender again,

but the record does not contain anymore discussion regarding appointed

counsel's role.

     Over one year before trial, the judge took a leave of absence.

Defendant's case was assigned to another judge, who later became the trial

judge. In his first appearance before the trial judge, defendant stated that

he was representing himself. The judge inquired if the public defender had

been appointed for consultation. The judge also asked if defendant had been

advised "in detail about the perils of going pro se." The assistant public

defender, acting as standby counsel, answered "yes" to both questions.

     In subsequent court appearances defendant continued to file and argue

numerous motions. The trial judge also asked defendant if he was exercising

his right to defend himself, and defendant said yes. The trial judge advised

defendant that the State was seeking the death penalty. He also told

defendant that he could have an attorney represent him "free of charge," and

strongly advised defendant not to represent himself. The judge asked

defendant the extent of his education. The judge also noted on the record

that he was aware that defendant had previously been through a criminal

trial. The judge told defendant that if he chose to represent himself he

would be treated as an attorney, without "special privileges." The judge then

allowed defendant to consult with standby counsel. After the recess defendant

requested that the court appoint counsel to represent him, but he specified

that he did not want the public defender appointed. The judge agreed and

appointed an attorney from the private bar.

     Defendant's case was continued repeatedly to allow appointed counsel to

prepare. However, defendant continued to file pro se motions, and eventually

asked the court to dismiss his appointed counsel, stating that he only wanted

the private attorney to function as standby counsel. The court dismissed the

private counsel and then reappointed standby counsel from the public

defender's office. Defendant represented himself at trial with the public

defender as standby counsel.

     Defendant's first allegation of error on appeal is that his waiver of

sixth amendment right to counsel (U.S. Const., amend. VI) was not knowingly

and understandingly made, warranting reversal of his convictions and

sentence.

     As a preliminary matter, we address the State's argument that defendant

waived the issue of the validity of his waiver of counsel because it was not

raised in the post-trial motions. People v. Enoch, 122 Ill. 2d 176, 186

(1988).

     Immediately after sentencing, the State Appellate Defender was appointed

to represent defendant on appeal. Four days later, appellate counsel filed a

notice of appeal. After appellate counsel filed the notice of appeal,

defendant filed a pro se motion for a new trial. The trial court never ruled

on the pro se motion. However, one year after the notice of appeal was filed,

and while defendant's case was on direct appeal to this court, appellate

counsel motioned for a limited remand to the trial court for the purpose of

filing and disposing of post-trial motions. We granted the motion and counsel

filed a post-trial motion and a post-sentencing motion, both of which the

trial court denied after a hearing.

     The issue of defendant's waiver of counsel was not contained in

defendant's pro se motion for a new trial. It was, however, timely raised in

the motions appellate counsel filed on remand. Accordingly, the issue is

preserved for review.

     Defendant argues that his waiver of counsel was not valid because the

trial court failed to adequately assess his ability to understand the choice

he was making. Defendant claims that the trial court was obligated to

specifically ask defendant his level of education, his prior legal

experience, and probe his mental and emotional capacity to represent himself.

     In Faretta v. California, the Supreme Court held that the sixth

amendment right to counsel (U.S. Const., amend. VI) implicitly provides for

the right of self-representation in criminal proceedings. Faretta v.

California, 422 U.S. 806, 821, 45 L. Ed. 2d 562, 574, 95 S. Ct. 2525, 2534

(1975). However, the defendant's waiver of counsel must be voluntarily,

knowingly, and understandingly made. See People v. Baker, 94 Ill. 2d 129, 136

(1983); People v. Baker, 92 Ill. 2d 85, 91 (1982); People v. Hessenauer, 45

Ill. 2d 63, 68 (1970). Before a criminal defendant's waiver of counsel will

be deemed valid the trial court must determine that defendant has the ability

to understand the proceedings, that he knows the significance and

consequences of his decision, and that his waiver was not coerced. See

Godinez v. Moran, 509 U.S. 389, 401 n. 12, 125 L. Ed. 2d 321, 333 n. 12, 113

S. Ct. 2680, 2685 n. 12 (1993). The entire record should be considered in

determining whether the waiver was knowingly and understandingly made. People

v. Barker, 62 Ill. 2d 57, 59 (1975).

     We believe that the court sufficiently assessed defendant's ability to

understand his waiver of counsel and appropriately found that defendant's

waiver of counsel was knowingly and understandingly made. A defendant's

background, experience and conduct are all factors to consider when

determining if a valid waiver of counsel has been made. Johnson v. Zerbst,

304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023 (1938). Two

different judges, on separate occasions, specifically asked defendant on the

record what level of education he had achieved. In addition, the court was

able to observe defendant's demeanor, appearance, and statements to otherwise

evaluate whether defendant had the ability to understand the choice he was

making in choosing to proceed pro se.

     Defendant's experience with the legal system is also readily apparent

from the record. In an early pretrial appearance, defendant interrupted the

judge's preliminary admonishments and recited Rule 401(a) verbatim. 134 Ill.

2d R. 401(a). When the same judge warned defendant that if he was convicted,

he could be eligible for an extended term of imprisonment, defendant informed

the court himself that he had a prior Class X offense. The record also

indicates that at least two of the judges defendant appeared before were made

aware through the discovery process of defendant's previous convictions. Each

judge that defendant appeared before was aware that defendant had a previous

capital trial in this matter and that he was represented by appointed counsel

at that trial. On this record, we conclude that the trial court considered

defendant's demonstrated familiarity with the legal system and properly

concluded that defendant could understand the significance and consequences

of his decision to waive counsel.

     Defendant's argument that no initial determination of his mental

capacity to knowingly waive counsel was made is also inaccurate.

Specifically, the record demonstrates that the judge who initially admonished

defendant had adequate opportunity to observe defendant and determine his

ability to make a knowing waiver of the right to counsel. Defendant

demonstrated a rational understanding of the charges against him and the

possible penalties. Moreover, defendant coherently participated in all phases

of the pretrial and trial proceedings and responded lucidly to each judge's

inquiries. Defendant filed numerous motions, examined witnesses and actively

presented a defense.

     Defendant further contends that the trial judge erred when he did not

specifically question defendant's mental capacity to waive counsel after

defendant told the judge that at defendant's first trial his counsel raised

the general issue of defendant's sanity.

     Three years into the pretrial period in this trial defendant filed a

motion for appointment of standby counsel other than the public defender.

When discussing the motion for new standby counsel, defendant informed the

trial judge that the basis of defendant's dissatisfaction with the public

defender was that in his first trial on these charges defendant's appointed

counsel from the public defender's office filed a motion on defendant's

behalf requesting that defendant be examined to determine his sanity at the

time of the offenses, his fitness to stand trial and any mitigating factors

as to the death penalty. Defendant contends that the failure of the trial

judge in this case to make appropriate inquiries regarding defendant's mental

capacity to waive counsel warrants reversal of his convictions and a new

trial.

     We disagree. Competence to waive counsel is measured by the same

standard as competence to stand trial. People v. Mahaffey, 166 Ill. 2d. 1, 19

(1995), citing Godinez v. Moran, 509 U.S. 389, 125 L. Ed. 2d 321, 113 S. Ct.

2680 (1993). In Illinois, a defendant is presumed competent to stand trial.

725 ILCS 5/104--10 (West 1992). The presumption is rebutted by evidence that

defendant is unable to understand the nature and purpose of the proceedings

against him or assist in his defense. 725 ILCS 5/104--10 (West 1992).

     In this case, defendant's conduct demonstrates an ability to understand

the proceedings and to assist in his own defense. Our review of the record

reveals that defendant's interactions with the court before and during trial

did not raise a bona fide doubt of his fitness. As noted previously,

defendant vigorously presented his defense. Further, the trial judge stated

on the record that defendant "seemed very, very lucid." On this record we

believe that the court evaluated defendant's mental capacity to waive counsel

and properly granted defendant's motion to proceed pro se.

     We also reject defendant's allegation that the numerous rambling motions

he filed during the three year pretrial period should have caused the court

to question his mental competency to waive counsel. Our review of the record

indicates that defendant's motions arguably exhibit a lack of comprehensive

knowledge of the law and principles of criminal procedure. Nonetheless,

neither the written motions nor the record of defendant's defense of the

motions demonstrate irrationality. Defendant's ability to articulate his case

or to precisely motion the court are merely measures of his proficiency or

lack thereof as a lawyer. His ability to represent himself is not indicative

of his competence to choose self-representation. Godinez, 509 U.S. at 400,

125 L. Ed. 2d at 333, 113 S. Ct. at 2687. Therefore, defendant's numerous and

voluminous motions or his imprecision in expressing himself as an attorney do

not demonstrate here that defendant lacked the mental capacity to waive

counsel.

     Defendant next argues that his waiver of counsel was invalid at

sentencing where the trial court failed to readmonish him of his right to

counsel after the verdict and before sentencing. This court has repeatedly

upheld the "continuing waiver" rule (People v. Johnson, 119 Ill. 2d 119, 147

(1987); People v. Baker, 92 Ill. 2d 85, 95 (1982)), which provides that

absent significantly changed circumstances or a later request for counsel, an

intelligently and knowingly made waiver of counsel applies to all phases of

trial. Baker, 92 Ill. 2d at 95.

     Defendant first argues that the court should have readmonished him prior

to sentencing because the admonishments he received regarding waiver of

counsel prior to trial were inadequate. As we have stated, we believe the

court properly evaluated defendant's ability to make a knowing and

understanding waiver of his right to counsel and find that the admonishments

given him before accepting defendant's waiver of counsel were sufficient.

     Defendant next claims that the mere nature of capital sentencing compels

readmonishment of pro se capital defendants before sentencing. However,

defendant offers no support for his argument. Defendant's brief citation to

Woodson v. North Carolina, 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978

(1976), is unpersuasive. In Woodson, the Supreme Court held that a North

Carolina statute imposing a mandatory death sentence on persons convicted of

first degree murder was unconstitutional because it allowed unbridled jury

discretion. Woodson, 428 U.S. at 305, 49 L. Ed. 2d at 961-62, 96 S. Ct. at

2991-92. In reaching its conclusion, the Court emphasized the qualitative

difference of the death penalty from a sentence of imprisonment. Woodson, 428

U.S. at 304-05, 49 L. Ed. 2d at 961, 96 S. Ct. at 2991. We agree that the

statement in Woodson reflects the need for individualized sentencing

determinations, but this general distinction does not support defendant's

specific argument that all pro se capital defendants must be readmonished

before sentencing. We have previously upheld the "continuing waiver rule" in

capital cases (People v. Simpson, No. 76889 (March 21, 1996); People v.

Johnson, 119 Ill. 2d 119 (1987)) and defendant offers no persuasive reason to

reexamine these holdings. We also note that defendant was subjected to a

capital sentencing hearing in his first trial on these charges and was

therefore aware of both the process and his right to counsel at sentencing.

     Defendant's next contention is that the issue of defendant's sanity,

raised by his appointed counsel in his first trial, coupled with his behavior

in this trial were circumstances that should have caused the court to

reexamine his capacity to proceed pro se at sentencing. We have noted,

however, that there is no suggestion in the record that defendant was

suffering from any condition that would impair his ability to knowingly and

understandingly waive counsel for the purposes of this trial. Defendant's

suggestion that his sanity may have been questioned in a previous trial is

not a circumstance that would require the court to reexamine defendant's

waiver of counsel before sentencing, absent indications of irrationality at

the present trial.

     Defendant also argues that the lapse of time between the beginning of

the trial period in this case and sentencing required that he be

readmonished. A lengthy delay between trial phases is one circumstance that

would possibly necessitate readmonishment of a pro se defendant prior to

sentencing. People v. Baker, 92 Ill. 2d 85, 93-94 (1982), citing Davis v.

United States, 226 F.2d 834, 840 (8th Cir. 1955). Here, defendant's pretrial

period stretched over three years, largely as a result of defendant's

requests for continuances. However, the court's admonitions and efforts to

have defendant accept appointed counsel continued until two months before

trial. Further, once the trial commenced no delay occurred between the guilt

phase and sentencing, which was held the day following the guilty verdict.

Defendant's reliance on Schell v. United States, 423 F.2d 101 (7th Cir.

1970), is distinguishable because the six-month delay in Schell occurred

between trial and sentencing, unlike the instant case where sentencing

immediately followed defendant's conviction.

     We also reject defendant's contention that he should have been

readmonished prior to sentencing because the court's initial admonishment did

not literally warn him that the waiver of counsel extended to "all phases of

the proceedings." The continuing waiver rule does not rest on the trial

court's use of specific language in the initial admonishment. People v.

Johnson 119 Ill. 2d 119, 145-46 (1987). Here, the court's admonitions prior

to accepting defendant's waiver of counsel included a warning that defendant

could face the death penalty. Defendant had also been represented by

appointed counsel during the capital sentencing hearing of his first trial on

these charges. Defendant cannot now argue that he is not familiar with his

right to counsel at sentencing.

                            B. Testimony of Ruby Bea

     Defendant next claims that he was denied a fair trial because the

prosecutor was allowed to elicit from the mother of the two victims remarks

that defendant believes were prejudicial. Although this issue was raised in

defendant's post-trial motion, he failed to offer a contemporaneous objection

at trial and has therefore waived the claim. It is well established that both

a trial objection and a written post-trial motion raising an issue are

required to preserve for review matters that could have been raised at trial.

People v. Mahaffey, 166 Ill. 2d 1, 27 (1995).

     Although issues not properly preserved may be considered on review under

the doctrine of plain error, we do not believe that the plain error doctrine

will defeat the waiver here. 134 Ill. 2d R. 615(a). Plain error may be

invoked in criminal cases where the evidence was closely balanced or the

error was of such magnitude that the accused was denied a fair trial. People

v. Bean, 137 Ill. 2d 65, 80 (1990). Neither element has been satisfied in the

case before us. The evidence of defendant's guilt was overwhelming, including

defendant's detailed confession which was corroborated by accounts of events

given by several witnesses. Additionally, substantial physical and

circumstantial evidence was presented and uncontradicted at trial.

     Nor do we believe the alleged error can be described as substantial. The

prosecutor asked Ruby Bea if she had problems since the death of her

children. Ruby responded that she was diagnosed with post-traumatic syndrome

and alcoholism. The prosecutor then asked if these problems were the reason

Ruby had difficulty remembering events, and Ruby answered yes. We do not

believe this isolated comment from the victims' mother, in response to a

query about her memory difficulties, was so substantial as to deprive

defendant of a fair trial.

                            C. Prosecutorial Remarks

     Defendant next claims that numerous remarks made by the prosecutor

during the guilt phase of the trial were improper. Defendant believes that

the remarks deprived him of a fair trial and warrant reversal of his

convictions.

     During defendant's pro se examination of one of the investigating police

officers, defendant probed the witness' knowledge of defendant's interactions

with the victims' family on the night of the offenses. The colloquy was

confusing, and the prosecutor objected, in an apparent attempt to clarify the

time period to which defendant was referring. The following exchange then

occurred:

               "PROSECUTOR: Objection. Is he talking about before or after he

          killed the children?

               THE COURT: Objection sustained.

               DEFENDANT: Object to that statement.

               THE COURT: The question posed by the State is stricken and

          disregarded by you. Go ahead. Move on."

     Defendant contends that the prosecutor's remarks inflamed the jury's

passion and prejudiced the jury against the defendant, depriving him of a

fair trial. We agree that the assistant State's Attorney's remark was

improper. However, the prompt sustaining of an objection by a trial judge is

ordinarily sufficient to cure any error in a question or answer before the

jury (People v. Hobley, 159 Ill. 2d 272, 315 (1994); People v. Baptist, 76

Ill. 2d 19, 30 (1979)), and we believe the same is true of the prosecution's

remark. The trial judge cured any prejudicial impact the comment may have had

on the jury by sustaining the defendant's objection and ordering the comment

stricken. People v. Enis, 163 Ill. 2d 367, 409 (1994).

     Defendant next argues that the prosecution misstated the evidence in his

closing remarks when he told the jury that defendant had made a confession to

a neighbor of the victims.

     At trial, Betty Gray testified that on March 4, 1984, at approximately

1:30 a.m., she was leaving Ruby Bea's apartment after Leola had been

discovered dead, but before Aretha's body had been found. Gray was in the

hallway when defendant charged up the stairs and asked where the individual

was that "killed the kids." Gray, who at that time was aware of only one

child's death, asked defendant how he knew what had happened. Defendant did

not respond and then left the building. On cross-examination, Gray stated

that she did not know whether anyone had informed defendant that something

had happened to the children.

     In his rebuttal argument at the close of the guilt-innocence phase of

trail, the prosecutor referred to this comment as defendant's confession to

Betty Gray. The court overruled defendant's objection to the comment.

Defendant alleges that the prosecutor mischaracterized defendant's statement

to Gray as a confession and thereby improperly limited the jury's

consideration that defendant's knowledge of the murders could have come from

another source.

     We agree with defendant that the prosecutor's description of defendant's

statement to Betty Gray as a confession is inaccurate. A confession is a

direct acknowledgment of guilt after the perpetration of an offense, and does

not embrace mere statements or declarations of independent fact from which

guilt may be inferred. People v. Stanton, 16 Ill. 2d 459, 466 (1959).

Defendant's comments to Gray did not directly acknowledge his commission of

the offenses; therefore, the prosecutor's characterization of the comment was

incorrect. However, prosecutors are afforded wide latitude in closing

argument and improper remarks will not merit reversal unless they result in

substantial prejudice to the accused. People v. Thompkins, 121 Ill. 2d 401,

445 (1988). Here, defendant's statement to Gray, coupled with other evidence

adduced at trial, allowed the reasonable inference that defendant possessed

guilty knowledge of the offenses. This was but one phrase in the

prosecution's lengthy closing argument. The jurors had heard Gray's testimony

and could weigh the implications of defendant's statement to Gray themselves.

Moreover, at the time of the prosecutor's remark, defendant's written

statement confessing to the crimes already had been read to the jury.

Therefore, we do not believe the prosecutor's mischaracterization of

defendant's comment to Gray was so substantial that it prejudiced defendant

and deprived him of a fair trial.

     In his final group of arguments pertaining to the guilt-innocence phase

of trial, defendant complains of a number of comments made by the prosecution

in summation and rebuttal. However, we need not consider the merits of

defendant's arguments regarding these prosecutorial statements. Although the

complained of closing remarks were raised in counsel's post-trial motion,

defendant did not object to any of the challenged remarks at trial, and we

therefore consider these issues waived. Mahaffey, 166 Ill. 2d 1, 27 (1995).

     We also believe that the complained-of remarks do not constitute plain

error. As noted, the prosecution presented substantial evidence of

defendant's guilt. Moreover, our review of the remarks indicates that none of

the comments was of the magnitude that it would have deprived defendant of a

fair trial. People v. Carlson, 79 Ill. 2d 564, 576-77 (1980).

     In his closing argument the prosecutor commented that the jurors should

not let defendant's decision to represent himself enter into their verdict.

He stated that defendant had a right to represent himself and that the jurors

should not feel sorry for defendant if "things didn't go exactly perfectly

for him." The prosecutor continued:

          "At any rate, he had each and every right that he had as a

          defendant. He did not lose any rights whatsoever as a defendant

          when he chose to represent himself. He retained those rights. In

          fact he gained rights. He had normal defendant's rights plus all

          the rights a lawyer had and was able to [sic] personally to

          question witnesses themselves and subpoena each and every witness

          he may want to and put anybody at all on the witness stand and

          elicit testimony about anything from anyone as long of course as he

          followed the Rules of Evidence that is relevant to this case."

     We do not agree with defendant's unsupported allegation that the jurors

would have understood the preceding comments as diminishing the burden of

proof or as suggesting that defendant bore the burden of proving his

innocence. The prosecutor was urging the jurors not to allow defendant's pro

se status to influence their verdict. The prosecutor was explaining that in

contrast to defendants who have counsel represent them, defendant had been

able to personally call and question witnesses. As we have stated, the

evidence was not closely balanced and we do not believe that the prosecutor's

brief statement regarding defendant's rights was of such a magnitude that it

prejudiced the jury's deliberation and deprived defendant of a fair trial.

     Defendant further claims that the prosecutor erred when he told the

jurors that if they found defendant guilty, they would have an opportunity to

learn more about the defendant at the next stage of trial. The comment came

at the end of the State's summation. The prosecutor stated that if the jury

found the defendant guilty, the trial would proceed to the next stage where

the jury would have opportunity to learn more "from both sides." He then

stated that if the jury did not find defendant guilty he would "walk out the

door."

     Construing the comment in context (People v. Cisewski, 118 Ill. 2d 163,

175-76 (1987)), we find no error. Earlier in the trial, during voir dire, the

judge had informed the jury that if there was a finding of guilty in this

case, a separate hearing would be held to determine if the death penalty

should be imposed. The comments challenged here were the prosecutor's final

plea to the jurors that they not allow the defendant to "go free." The

statement that the jurors would learn more if a guilty verdict was returned

simply reminded the jurors that if they returned a guilty verdict, a penalty

would be imposed, but a separate proceeding would be held to determine what

that penalty would be.

     Finally, defendant challenges the prosecutor's statement during his

rebuttal statement that "it is not too often the People of the State of

Illinois have a case with this much evidence." The prosecutor also stated

that the State's burden was "just proof beyond a reasonable doubt." The

comment was made after defendant's closing argument where he urged the jury

to find that the evidence was insufficient to convict him. The prosecutor's

comment was a response to defendant's own comments, and therefore was not

error. People v. Mahaffey, 128 Ill. 2d 388, 425 (1989).

                  II. FAILURE TO APPOINT MITIGATION SPECIALIST

     Defendant next alleges that the trial court committed reversible error

when it denied defendant's motion for appointment of a mitigation specialist.

     Eighteen months before trial, defendant presented a motion to the court

titled "Petition For Funds To Be Provided For An Investigator *** Which Would

Include, But Not Be Limited To Interviews With Potential Witnesses and

Character Witnesses For The Defense." The motion sought court appointment of

a specific individual to assist defendant regarding "potential witnesses and

character witnesses for the defense." The judge initially denied the motion.

The basis for denial was that the public defender was equipped to perform

such interviews and it was defendant's choice to decline such assistance.

After the initial denial, the prosecutor suggested to the judge that

defendant was seeking more than routine investigative services. The judge

asked defendant to elaborate, and he responded that he was seeking "character

witnesses." The judge asked defendant if he wanted witnesses for the purpose

of a sentencing hearing. Defendant answered "in the event." The judge then

told defendant that she would defer a ruling on the motion.

     Four months later, before any ruling was made on the motion, the judge

took a leave of absence and defendant's case was transferred to the trial

judge. After 10 more months of pretrial proceedings, the trial judge

attempted to set a trial date and gave defendant a deadline to resolve the

issue of any outstanding motions. Before the hearing was held to dispose of

the motions, the judge and defendant again discussed contacting witnesses.

Defendant continued to object to the services of the public defender in any

capacity, including to help him locate and subpoena witnesses. The judge

nonetheless explained to defendant that although defendant was representing

himself, he could use standby counsel to locate and subpoena witnesses.

Defendant did not mention his motion for funds to hire an investigator at

that time.

     Soon thereafter, a hearing was held to dispose of all of defendant's

outstanding motions. Defendant did not reintroduce the request for

appointment of an investigator or seek a ruling on the previously filed

motion. When the trial judge declared that he had disposed of all of the

motions, defendant objected. Defendant then mentioned a motion to dismiss,

but still did not call the judge's attention to his request for investigative

assistance. Between the date of the hearing during which all motions were to

be disposed of and the trial date, defendant was allowed to file additional

motions. None of the motions, however, revisited the issue of appointment of

an investigator.

     On these facts it is not clear that defendant ever requested a

mitigation specialist. Defendant admits that his request for an investigator

was "broadly written" and that he never defined the purpose of his request

other than to facilitate investigation of "character witnesses." Defendant

argues that by naming a particular individual who is a mitigation expert in

his written request, defendant properly defined the particular expertise he

sought. The written motion seeks "to employ the services of David Randall and

Associates, Psychosocial and Forensic Consultation [address]." The request

does not discuss the functions the expert would perform. The judge queried

defendant when he tendered the request but defendant did not expound his

reasons for the request.

     Because defendant failed to explain to the judge why he sought funds to

hire the expert, we believe defendant did not sufficiently advise the court

that he was requesting assistance to obtain mitigation evidence.

     Further, defendant has waived his claim. A movant has the responsibility

to obtain a ruling from the court on his motion to avoid waiver on appeal.

People v. Schmitt, 131 Ill. 2d 128, 137 (1989). Although defendant appeared

before more than one judge, as his own counsel he was burdened with the

responsibility to track the motions and to monitor their disposition, which

he did not do. The judge to whom defendant initially tendered his request

made it clear on the record that she was reserving a ruling on the motion.

Subsequently, when the next judge asked defendant if he had other outstanding

motions, defendant failed to preserve this issue when he did not call to the

attention of the court his outstanding request for appointment of an

investigator.

     Plain error will also not defeat the waiver. The State presented

extensive evidence of a gruesome crime in aggravation. No witnesses testified

in mitigation. The State's evidence included expert testimony regarding the

extreme pain and suffering of the child victims. For example, the expert

witness commented that the pain Leola would have experienced from her vaginal

injuries would be "one of the worst kinds of pain you could experience." The

State also introduced defendant's lengthy criminal record, including his

previous convictions for sexual assault and attempted murder.

     We also believe that defendant's lack of funds for a mitigation expert

did not result in an unfair sentencing hearing. The mitigation evidence

defendant suggests an expert would have presented is purely speculative.

Defendant contends that had an expert been appointed, there were several

avenues of "potentially fruitful" mitigation which could have been pursued.

However, the record contains no evidence of what mitigating evidence

defendant would have introduced or might have argued. While defendant argues

that his lengthy incarceration generally made contacting witnesses difficult,

he does not explain his failure to present the testimony of his family

members, whom he claimed to have spoken with repeatedly about obtaining a

private attorney. Moreover, defendant's allegation that a mitigation witness

could have investigated his psychiatric background is questionable.

Defendant's decision to reject assistance of the public defender was based on

his objection to any portrayal of him as a person with psychiatric problems.

We find inconsistent defendant's argument that he would have been willing to

have anyone present such evidence if it were available. Accordingly,

defendant has not demonstrated that even if a mitigation expert had been

appointed, there was a reasonable probability that defendant's sentence would

have been different. See People v. Hall, 157 Ill. 2d 324, 340 (1993).

                             III. SENTENCING ISSUES

                           A. Pathologist's Testimony

     Defendant claims that he was denied a fair sentencing hearing because

the court allowed the State to present cumulative and prejudicial testimony

of an expert, Dr. Donoghue, in aggravation. Defendant acknowledges that Dr.

Donoghue's testimony was relevant, but alleges that it was duplicative of

testimony at the guilt phase and was therefore inflammatory and prejudicial.

However, we do not reach the merits of this issue. Although defendant raised

the issue in his post-trial motion, he did not object to Dr. Donoghue's

testimony at sentencing and thereby has waived the issue for review. People

v. Enoch, 122 Ill. 2d 176, 186 (1988).

     We also reject defendant's argument that the plain error doctrine will

overcome the procedural default. 134 Ill. 2d R. 615(a). As we have already

noted, the evidence against defendant in aggravation was overwhelming and

uncontroverted. Therefore, we need only examine if the alleged error was of

such a magnitude that it deprived defendant of a fair trial. People v. Bean,

137 Ill. 2d 65, 80 (1990).

     At the guilt phase of trial, Dr. Donoghue related the number and

characteristics of the injuries each victim suffered. At sentencing, Donoghue

repeated a description of the injuries of each of the victims. However, Dr.

Donoghue's testimony also concerned the degree of pain and suffering of each

victim and the time of death relative to the rape and injury of each victim.

Our review of the record indicates that the repetitive testimony was

contextually appropriate to frame Dr. Donoghue's testimony regarding the

victims' pain and time of death.

     The nature of the contested evidence here contrasts with that in People

v. Williams, 161 Ill. 2d 1 (1994), relied on by defendant. In Williams, the

defendant was deprived of a fair sentencing hearing where the prosecutor was

allowed to use an oversized demonstrative aid to unnecessarily memorialize

clearly understandable testimony of defendant's criminal history. Williams,

161 Ill. 2d at 68. The contested evidence in Williams was wholly cumulative,

where here the pathologist's testimony during the penalty phase of the

proceeding put before the jury evidence of the nature of the crime and the

pain suffered by the victims. Accordingly, the trial court did not err in

admitting Dr. Donoghue's testimony which was relevant to the nature of the

crimes and the harm inflicted on the victims, issues relevant to the

sentencing proceeding. People v. Hobley, 159 Ill. 2d 272, 317 (1994).

                      B. Participation of Standby Counsel

     In the aggravation phase of sentencing, Iola Warren testified for the

prosecution that in 1979 defendant raped her and strangled and stabbed her

mother. Iola's mother, Geraldine Warren, also testified. Before defendant

cross-examined Geraldine Warren, he was granted a recess to consult with

standby counsel. When the hearing resumed, defendant asked the court to allow

standby counsel to examine the witness because defendant did not "want to add

to her anxiety, frustration of [sic] me." The prosecutor offered the opinion

that he did not think defendant was entitled to have standby counsel examine

the witness. The trial judge reminded defendant that he had made a choice to

defend himself and therefore would defend himself "all of the way through."

The trial judge then denied the request on the basis that standby was not the

attorney of record, but was only present in a standby capacity. Defendant

proceeded to cross-examine the witness without disruption or outburst.

     Defendant contends that the trial judge abused his discretion when he

denied defendant's request to allow standby counsel to cross examine

Geraldine Warren. Defendant alleges that his constitutional right to counsel

(U.S. Const., amend. VI) was denied when the court first appointed standby

counsel and then denied defendant's request to allow standby a more active

role.

     The right of self-representation does not carry with it a corresponding

right to legal assistance; one choosing to represent himself must be prepared

to do just that. People v. Gibson, 136 Ill. 2d 362, 383 (1990). However, the

trial court has broad discretion to appoint counsel for advisory or other

limited purposes (People v. Allen, 37 Ill. 2d 167, 172 (1967)) and to

determine the nature and extent of standby counsel's involvement (see People

v. Smith, 249 Ill. App. 3d 460, 470-71 (1993)). Even where a trial court

appoints standby counsel, the constitutional right to self-representation

does not require a court to permit a "hybrid" representation in which a

defendant alternates between representing himself and having counsel

represent him. Cain v. Peters, 972 F.2d 748, 750 (7th Cir. 1992), citing

McKaskle v. Wiggins, 465 U.S. 168, 183, 79 L. Ed. 2d 122, 136, 104 S. Ct.

944, 953 (1984); People v. Taggart, 233 Ill. App. 3d 530, 557 (1992).

     We cannot say here that the trial court's refusal to allow standby

counsel to cross-examine a witness was an abuse of discretion. In the

pretrial phase, defendant adamantly resisted the court's repeated offers of

appointed counsel. Defendant strongly resisted the appointment of standby

counsel and ultimately accepted standby counsel only after the trial judge

explained that standby counsel's role would be strictly limited. Moreover,

the trial judge repeatedly informed defendant that the scope of standby

counsel's participation would be very narrow and that if defendant chose

self-representation, he would be bound by that decision throughout the trial.

Defendant represented himself throughout the guilt phase and the eligibility

hearing without seeking the active participation of standby counsel. The

trial judge reasonably exercised its discretion in limiting standby counsel's

participation to an advisory role.

     People v. Lindsey, 17 Ill. App. 3d 137 (1974), on which defendant

relies, is distinguishable. In Lindsey, the trial court allowed defendant to

act as his own counsel with appointed counsel in a "co-counsel" role. The

court stated that defendant would be proceeding pro se with counsel to

"assist him." Counsel participated and objected during the examination of the

State's first two witnesses. Later, the trial court refused to allow counsel

to question several witnesses or to make objections. The appellate court held

that it was an abuse of discretion to initially allow counsel to actively

participate and then later restrict the availability of counsel to assist the

defendant. Lindsey, 17 Ill. App. 3d at 143-44.

     In this case, the trial judge and the other pretrial judges consistently

warned defendant that standby counsel's role would be very limited. Defendant

was never led to believe that standby would be allowed to actively

participate at trial. Unlike the defendant in Lindsey, here defendant cannot

say that he reasonably held an expectation that standby counsel would be

available to make objections or examine witnesses.

     We do not agree with defendant that because his request was "reasonable

under the circumstances" it should have been granted. Defendant fails to

demonstrate any change in circumstances that necessitated a change in the

level of standby counsel's participation. The record does not reflect that

examination of Geraldine Warren posed any more difficulty than cross-

examination of other witnesses, including Ruby Bea, the mother of the

victims, Iola Warren, a victim of defendant's prior crime, or Reynard McRay,

an inmate allegedly raped by defendant.

     Even if we accepted defendant's contention that the court's refusal to

acquiesce in defendant's desire for a hybrid representation violated his

right to counsel, we believe that it was harmless error beyond a reasonable

doubt. Defendant's characterization of Geraldine Warren's testimony as a

"linchpin" of the prosecution's case in aggravation is unfounded. In the

event that Geraldine Warren's testimony had been impeached, substantial

evidence of the rape of Iola and the stabbing of Geraldine would nonetheless

be before the jury. Iola gave a detailed description of the crimes, and the

State later offered a certified copy of defendant's conviction for the rape

of Iola Warren and the attempted murder of Geraldine Warren.

     We note that after the court denied defendant's request to have counsel

question the witness, defendant cross-examined Geraldine Warren. The record

does not reflect any overt antagonism that infected defendant's ability to

elicit answers to his questions. Defendant explored inconsistencies between

Geraldine's testimony and a hospital report. Defendant's contention that the

witness was upset and that a different result "probably" would have obtained

is purely speculative. On these facts, we cannot say that had standby counsel

cross-examined Geraldine Warren the sentencing jury would have reached a

different result.

                              C. Jury Instruction

     At sentencing, the jury was properly instructed that defendant could be

sentenced only to natural life imprisonment without parole if the jury did

not impose the death sentence. Ill. Rev. Stat. 1983, ch. 38, par. 1005--8--

1(a)(1)(c); Illinois Pattern Jury Instructions, Criminal, No. 7C.05 (3d ed.

1992) (hereinafter IPI Criminal 3d). After the court gave IPI Criminal 3d No.

7C.05, the court then instructed the jury on issues in aggravation and

mitigation. The final paragraph of the instruction told the jurors that if

they did not find mitigating factors sufficient to preclude imposition of the

death penalty, then they should sign the verdict requiring the court to

"impose a sentence other than death." IPI Criminal 3d No. 7C.06.

     Defendant contends that the language of IPI Criminal 3d No. 7C.06,

coupled with that of IPI Criminal 3d No. 7C.05, created confusion and allowed

the jury to believe that defendant was eligible to receive a prison term of

years and that he could be paroled. Defendant argues that he is entitled to

a new sentencing hearing because the contradictory instructions deprived him

of a fair hearing.

      Defendant has waived this issue because he neither objected to the

challenged instruction at trial nor offered an alternative instruction. It is

well established that a defendant generally cannot challenge an instruction

on appeal unless he made a contemporaneous objection at trial and, where

appropriate, tendered an alternative instruction. People v. Rissley, 165 Ill.

2d 364, 406 (1995).

     Under an exception to the waiver rule, substantial defects in

instructions are not waived by failure to make timely objections thereto, if

the interest of justice so requires. 134 Ill. 2d R. 451(c). The plain error

rule applies when the evidence is closely balanced or when the error is of

such a magnitude that it deprives the defendant of a fair trial. Carlson, 79

Ill. 2d at 576-77. As previously noted, the evidence against defendant in

aggravation was substantial and defendant offered no evidence in mitigation.

We need only consider if the alleged error in instructions deprived defendant

of a fair trial.

     In People v. Gacho, 122 Ill. 2d 221 (1988), this court held that where

a defendant has been found guilty of multiple murder, it is an incomplete

statement of the law to instruct the jurors that if they find sufficient

mitigating factors to preclude imposition of the death penalty, "the court

shall sentence the defendant to imprisonment." Gacho, 122 Ill. 2d at 262;

Illinois Pattern Jury Instructions, Criminal, No. 7A.15 (2d ed. 1981)

(hereinafter IPI Criminal 2d). This court found that such an incomplete

statement of sentencing alternatives could lead the jury to erroneously

believe the only way of keeping the defendant from society would be to impose

the death penalty. Gacho, 122 Ill. 2d at 262.

     Following this court's opinion in Gacho, trial courts must specifically

instruct the jurors in cases involving a defendant convicted of multiple

murders that if "they find mitigating factors sufficient to preclude

imposition of the death penalty, defendant will be sentenced to natural life

imprisonment, and no person serving a term of natural life imprisonment can

be paroled or released except through executive clemency." Gacho, 122 Ill. 2d

at 262.

     As defendant points out, IPI Criminal 2d No. 7C.06 was formulated before

this court's decision in Gacho. Illinois Pattern Jury Instructions, Criminal,

No. 7C.06 (2d ed. Supp. 1987). When IPI Criminal 2d No. 7C.06 was later

revised, it did not include language applicable to sentencing a defendant

convicted of multiple murder. Defendant argues that the unrevised language of

IPI Criminal 3d No. 7C.06 conflicts with IPI Criminal 3d No. 7C.05 and

cancels the effectiveness of the Gacho instruction which was given in this

case.

     We disagree. Standing alone IPI Criminal 3d No. 7C.06 could lead the

jury to incorrectly believe that defendant could be sentenced to a term of

imprisonment which could lead to parole. However, when the complained-of

instruction is reviewed in context (People v. Terry, 99 Ill. 2d 508, 516

(1984)) with IPI Criminal 3d No. 7C.05, it is clear that only two

alternatives existed for defendant's sentence: (1) the death penalty or (2)

natural life imprisonment. The complained-of instruction, IPI Criminal 3d No.

7C.06, told the jurors that based on their weighing of aggravating and

mitigation factors, the court would either impose the death sentence or a

sentence "other than death." That instruction, coupled with IPI Criminal 3d

No. 7C.05, also given in this case, correctly instructs the jury that the

"other than death" sentence will be natural life imprisonment without the

possibility of parole or release except through executive clemency. Unlike

Gacho, where the jury was given incomplete information regarding the range of

sentencing alternatives the defendant might receive, the jury here was given

the precise sentencing alternatives statutorily available.

     Further, the instruction regarding the verdict forms, given shortly

after the complained-of instruction, and the verdict form itself, accurately

stated that if the jury found sufficient mitigating evidence "the court shall

impose the sentence of natural life imprisonment."

     Because IPI Criminal 3d No. 7C.05 and the verdict forms explain the

sentence other than death referred to in IPI Criminal 3d No. 7C.06, we

believe the jurors were correctly instructed regarding the sentencing

alternatives. Because we find the jury instructions were not improper, we

need not analyze the issue under the waiver exception.

     Defendant further contends that a prosecutorial remark in closing and a

jury instruction given at the eligibility phase exacerbated the alleged

confusion created by the instructions. Defendant has waived consideration of

these issues for failure to object at trial. Rissley, 165 Ill. 2d at 406.

                    D. Prosecutorial Comments at Sentencing

     Defendant next argues that the prosecutor's comment in his closing

argument at the aggravation and mitigation phase of sentencing was inaccurate

and improper.

     In his closing remarks to the jury in the aggravation and mitigation

phase of the sentencing hearing, the prosecutor discussed defendant's

criminal history. At the conclusion of his recitation of defendant's previous

convictions, the prosecutor urged the jury to sentence defendant to death.

The prosecutor told the jury that the time to impose the death penalty was

"long, long overdue" for defendant. Defendant did not object to the comment

during the sentencing hearing, and therefore he has waived the point. People

v. Fields, 135 Ill. 2d 18, 55 (1990).

     Plain error will not defeat the procedural bar because, as noted

previously, the evidence in aggravation was uncontroverted and not closely

balanced. Moreover, we do not believe error occurred. We reject defendant's

contention that the challenged remark served only to inflame the jury.

Prosecutor's are afforded wide latitude in closing argument (People v.

Thompkins, 121 Ill. 2d 401, 445 (1988)), and we believe the State's argument

that jury could have understood the remark to refer to the nine-year lapse

between the crime and the sentencing proceeding.

                              IV. CUMULATIVE ERROR

     Defendant next contends that the cumulative effect of the alleged errors

at sentencing denied him a fair hearing and warrant reversal of his death

sentence. Having found no errors, we reject defendant's contention.

V. CONSTITUTIONALITY OF DEATH PENALTY CLAIMS

     Defendant's final allegations of error challenge the constitutionality

of certain provisions of the Illinois death penalty statute, section 9--1 of

the Criminal Code of 1961.

     Defendant first claims that his death sentence must be vacated and

remanded for a new hearing because it was based in part on an

unconstitutional provision of our Criminal Code, section 9--1(b)(7) (Ill.

Rev. Stat. 1983, ch. 38, par. 9--1(b)(7)). Defendant contends that the terms

used in the statute to define the conduct that will sustain a finding of

eligibility, "exceptionally brutal or heinous behavior indicative of wanton

cruelty" (Ill. Rev. Stat. 1983, ch. 38, par. 9--1(b)(7)), are facially vague

and therefore unconstitutional.

     Relying on the Supreme Court's decisions in Maynard v. Cartwright, 486

U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988), and Shell v.

Mississippi, 498 U.S. 1, 112 L. Ed. 2d 1, 111 S. Ct. 313 (1990), defendant

alleges section 9--1(b)(7) fails to provide principled guidance for the

sentencer's discretion in imposing the death penalty. However, this court has

previously considered the constitutionality of section 9--1(b)(7) in light of

Maynard and has held that section 9--1(b)(7) does not suffer from the same

constitutional infirmity as the statue in Maynard. People v. Odle, 128 Ill.

2d 111, 138-41 (1988).

     We also find defendant's reliance on Shell v. Mississippi, 498 U.S. 1,

112 L. Ed. 2d 1, 111 S. Ct. 313 (1990), unpersuasive. In Shell, the Supreme

Court found the trial court's limiting instruction, defining an aggravating

factor identical to that in Maynard, to be constitutionally insufficient.

Shell, 498 U.S. at 4, 112 L. Ed. 2d at 5, 111 S. Ct. at 314. This court's

decision in Odle, holding that section 9--1(b)(7) was not unconstitutionally

vague, rested on the distinction between the language of the aggravating

factor in the Oklahoma statute at issue in Maynard and the more specific

description which qualifies an accused for the death penalty in Illinois.

Odle, 128 Ill. 2d at 140. The language of the aggravating factor in the

Mississippi statute at issue in Shell is identical to the statutory language

challenged in Maynard, and therefore section 9--1(b)(7) is distinguishable on

the same basis.

     This court has repeatedly affirmed its holding in Odle that the

statutory language of section 9--1(b)(7) sufficiently channels the discretion

of the sentencer. People v. Banks, 161 Ill. 2d 119, 146-47 (1994); People v.

Lucas, 132 Ill. 2d 399, 443-46 (1989); People v. Kidd, 129 Ill. 2d 432, 454-

56 (1989). Defendant offers no persuasive ground to support his request that

we reconsider the holding in Odle, and we decline to do so.

     In a related argument, defendant claims the jury instructions in the

eligibility phase of the sentencing hearing did not adequately define the

language of section 9--1(b)(7). At sentencing, over defendant's objections

the judge instructed the jury on the definition of the words "brutal" and

"heinous" as contained in section 9--1(b)(7). IPI Criminal 3d Nos. 7B.07A,

7B.07B. Defendant objected to the instruction because he did not believe the

jury needed "to be educated as to what is [sic] an aggravating factor."

Defendant's argument on appeal, that the instructions were too vague to offer

principled guidance to the jury, is inconsistent with his objection at trial.

Defendant also failed to submit an alternative instruction. Therefore, we

find defendant has waived his argument. Rissley, 165 Ill. 2d at 406.

     We also believe that plain error analysis will not defeat the waiver. In

compliance with this court's holding in People v. Lucas, 132 Ill. 2d 399,

448-49 (1989), the judge in this case instructed the jury on the definitions

of the statutory terms at the sentencing hearing. Brutal was defined as

"grossly ruthless, devoid of mercy or compassion, cruel, and cold-blooded."

IPI Criminal 3d No. 7B.07A. Heinous was defined as "hatefully or shockingly

evil, grossly bad, enormously, and flagrantly criminal." IPI Criminal 3d No.

7B.07B. The instructions gave a sufficient explanation and an adequate

limiting construction and we believe no error occurred.

     Defendant next argues that the Illinois death penalty statute violates

the eighth and fourteenth amendments because it places a burden of proof on

the defendant and precludes meaningful consideration of mitigation. We have

previously rejected this claim (Rissley, 165 Ill. 2d at 408; People v. Page,

155 Ill. 2d 232, 283 (1993); People v. Mitchell, 152 Ill. 2d 274, 345-46

(1992)) and do so again here. We have also held that the death sentencing

procedure is not unconstitutional where the prosecution is allowed to have

both initial and rebuttal arguments at the sentencing hearing. Page, 155 Ill.

2d at 282-83.

     Finally, defendant claims that various aspects of the Illinois death

penalty statute, in combination, invite the risk of arbitrary or capricious

imposition of death sentences. Defendant admits that this court has

previously examined and rejected the constitutional challenges defendant

raises. See People v. Whitehead, 116 Ill. 2d 425 (1987); People v. Albanese,

102 Ill. 2d 54 (1984); see also People v. Tenner, 157 Ill. 2d 341, 390

(1993); Page, 155 Ill. 2d at 284-85. Defendant suggests the previously

rejected grounds for finding the statute unconstitutional, when considered

cumulatively, render the statute unconstitutional. However, this court has

held that if the individual aspects of the statute are constitutional, then

it follows that the whole is constitutional. People v. Phillips, 127 Ill. 2d

499, 542-43 (1989).

                                   CONCLUSION

     For the reasons stated, the judgement of the circuit court of Cook

County is affirmed. The clerk of this court is directed to enter an order

setting Tuesday, November 12, 1996, as the date on which the sentence of

death entered in the circuit court of Cook County is to be carried out. The

defendant shall be executed in the manner provided by law. 725 ILCS 5/119--5

(West 1994). The clerk of this court shall send a certified copy of the

mandate in this case to the Director of Corrections, to the warden of

Stateville Correctional Center, and to the warden of the institution where

defendant is confined.

Affirmed.